UNITED STATES INDUSTRIAL ALCO-
HOL CO. (WEST VIRGINIA) v. HELVER-
ING, Commissioner of Internal Revenue.

HELVERING, Commissioner of Internal
Revenue, v. UNITED STATES INDUS-
TRIAL ALCOHOL CO.

No. 17.

Circuit Court of Appeals, Second Circuit.

July 21, 1943.

512

John Enrietto and C. F. Rothenburg, both of Washington, D. C. (Hamel, Park & Saunders, of Washington, D. C., of counsel), for the taxpayer.

Samuel O. Clark, Jr., Ass't Atty. Gen., Sewall Key, Samuel H. Levy, and Newton K. Fox, Sp. Ass'ts to Atty. Gen., of Washington, D. C., for the Commissioner.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Both the taxpayer and the Commissioner appeal from orders assessing deficiencies in income tax, assessed against the taxpayer for the years 1928 and 1929; and denying the taxpayer's claims of overpayment. The taxpayer's appeal, which is the more important, involves four points: First, whether the Tax Court erred in refusing to allow any deduction for depreciation upon certain contracts for the sale of alcohol which were purchased by the taxpayer in the year 1929, and expiring on December 31st of that year: second, whether it erred in refusing to allow depreciation for wear and tear upon drums in which industrial alcohol was sold by the taxpayer in the years 1928 and 1929: third, whether a gain in the taxpayer's sale of shares of stock in a company, known as the Agni Motor Fuel Company, should have been included in 1929, or in 1930: fourth, whether the Tax Court erred in appraising losses in the taxpayer's equipment during the year 1929. The Commissioner's appeal is from an allowance to the taxpayer for payments made to the wholly owned subsidiary or an affiliate. As there are in effect five separate appeals, it will be simpler to consider them as though they were such, stating the facts in each and then discussing their legal effect.

### Depreciation Upon Contracts Bought.

In 1929 the taxpayer purchased substantially all the assets of another distilling company—the Kentucky Alcohol Company—and assumed its liabilities. Among the assets so purchased were 214 contracts already made by the Kentucky Company with customers, or brokers, or jobbers, for the delivery of industrial alcohol before the end of the year. Each contract required the buyer to accept no more than a specified maximum, but no less than a specified minimum, number of wine gallons; and on June 15, as of which date the sale was concluded, the undelivered maximum was 8,794,464 gallons, and the undelivered minimum was 7,545,122 gallons. The contract prices were at, or a little under, the market prices at the time the contracts were made, and the parties expected that the buyers would accept about 7,500,000 gallons. Most of the contracts provided that the prices were to be "firm and uncancellable, without any protection against decline in prices"; but in several instances, the taxpayer, like the Kentucky Company before it, did not force upon the buyer even the minimum which he had promised to take, and in some instances it sold to him at a reduced price. The customer was expected to take the min-

imum; or, if that was in excess of his requirements, he was still expected to take at least his requirements; but, if the enforcement of the contract would result in his being obliged to carry over an excess stock, to be later disposed of at forced prices, that was thought undesirable, as the seller might lose him as a customer. Of the buyers under these contracts, a little over one-third continued to buy of the taxpayer in 1932; and these bought in the aggregate nearly fifty per cent as much as the total sales in 1929. The jobbers and brokers of the Kentucky Company in 1929 were operating in twelve cities; in 1932 they continued to operate in six of these.

The Tax Court found that in nineteen contracts the prices were guaranteed to be no higher than the prices offered by the Kentucky Company's competitors in 1929; and that in one instance, the purchaser was guaranteed against any decline in price. It also found that the contracts "as a practical matter * * * were regarded under the apparently universal custom of the industry, not as contracts for unqualified quantities and at unchangeable prices, but as the recognized method of booking orders for future deliveries." Again: "The significance of the contracts lies not in whether or not they were legally enforceable, but in whether the petitioner can be regarded as having acquired them with any idea that they would be enforced, or that their enforceability, if any, had value for it, or that this quality contributed in any substantial degree to the value of the business for which the purchase price was paid, so that any significant sum could be attributed to it." Again: The contracts "are to be treated as of no different consequence than" (sic) "unfilled customer's orders in other lines of business." The books did not disclose any depreciation account for the contracts; nor did such an item appear in the return for 1929. The Tax Court held that the contracts contributed a value to the assets analogous to that of good will, and could not, therefore, be exhausted; for this reason it denied the deduction.

If we limit our consideration to a single contract of sale, there are only two inducements which will lead to its purchase: (1) it may have been made at a higher price than the market price at the time when the assignee buys it; (2) if it has not, it may cost the assignee something in time and money to secure an equivalent contract at the market price. The first inducement could not have existed in the case at bar because, although it does not positively appear that the market prices on June 15th, 1929, were no higher than the contract prices, it is fairly to be inferred from testimony quoted below that there was nothing beyond normal profit in the contract at that time. Indeed, more than half the gallonage had just been contracted for in May and June. We do not forget that there was a profit of twenty cents per gallon in the contracts, but that is irrelevant if twenty cents was the usual profit upon sales at market prices. As to the second reason, there was evidence that it had cost the Kentucky Company more than $252,000 to secure the contracts, and while the Tax Court need not have accepted that figure, it refused to consider the issue at all, and that would have been an error, if the amount were relevant. It would have been relevant, if all that the taxpayer got when it bought the contracts was the right to "put" to the buyers the actual gallonage covered by them: i. e. if their only value had been in those particular sales. This might also be true, even though, as the Tax Court found, the contracts were not intended to be enforced as they read, but were to be softened, so to speak, both in quantity and in price, provided that the buyers bought up to their requirements. It would then have been necessary to find how much the taxpayer would have had to spend to get equivalent contracts, and possibly the Kentucky Company's expense would have been a proper measure.

■ If the taxpayer had meant to close up the business on December 31st, 1929, we should therefore have felt bound to reverse upon this point. But it was buying a going business which it expected to continue, and there was abundant evidence to support the findings of the Tax Court that one purpose —indeed, the primary purpose—was to insure a market, not only until the end of the year but for an indefinite time thereafter. In such an industry—for that matter, in any industry—continuity of sales is a condition of continued existence; once they stop, it is extremely hard, if not impossible, to start up the business again. Therefore the power to sell over the period immediately after the business is taken over, insuring as it does against such a break, has a value quite independent of any profit that may be got from those particular sales. There is no reason to suppose in the case at bar that the

taxpayer would have paid anything whatever for the contracts if they had not contributed in this way to the continued existence of the business. Indeed, it was permissible for the Tax Court to find—though it did not do so—that the taxpayer expected no profit whatever from the contracts. At least, so its chairman of the board, Adams, appears to have thought. "We paid a million and a half dollars for contracts out of which we expected to make no profit, and we paid one million nine for everything else we got. Of course we got no profit in 1929. We expected when we agreed to pay a million and a half dollars for those contracts to get a benefit in future years, by reason of that particular payment that was all in the million and nine."

The industrial advantage so secured was not an exhaustible asset; it is of no importance that in three years less than half of the output for 1929 continued to be sold to buyers of that year. The contracts would have served their purpose had the personnel of the buyers completely changed, for it was only by keeping the business alive by a continuous market that its value was maintained at all. For this reason the Commissioner could safely have conceded that Adams's estimate of $1,500,000 as the price which he paid for the contracts was right; he was paying for what was a necessary condition upon any value to the plant as an industrial unit. The Tax Court was quite right therefore in assimilating the situation to the purchase of a newspaper with its list of subscribers; and in holding that the contracts were analogous to goodwill. It would have been mere surmise to suppose that the value contributed by them· had in any degree disappeared on December 31st, 1929. Once more to quote Adams: "We agree to pay a million and a half dollars * * * to get a benefit in future years."

### Depreciation of the Steel Drums.

The next item is for the depreciation of drums used to ship alcohol. Until the year 1932 whenever the taxpayer shipped alcohol it charged the buyer six dollars for the drum (a little more than its cost) which the buyer agreed to return in ninety days. If he did, he was credited with six dollars and the drum was used again, and so on until it became too worn out for further service, or the supply became too large. It was then sold, or junked, for whatever it would bring. The taxpayer between 1922 and 1929 did not keep any account on its books of gradual deterioration of these drums; nor did it claim any such deduction in its returns; it merely claimed a deduction of six dollars when the drum was finally scrapped or sold—charging itself with whatever was salved. It was not until November 1931 that it suggested any change and claimed an overpayment for 1928 and 1929, based upon a depreciation of the whole mass of drums, calculated upon a uniform deterioration over a· stipulated life of ten years. The Commissioner denied this claim and the Tax Court affirmed his ruling.

Section 41 of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 363, directed a taxpayer's income to be computed "in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but * * * if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the commissioner does clearly reflect the income." Article 322 of Regulations 74, which were promulgated for the Act of 1928, enacted that a taxpayer who wished to change his "method of accounting employed in keeping his books * * * should, before computing his income on such new basis for purposes of taxation, secure the consent of the Commissioner," for which he must apply "at least 30 days before the close of the period to be covered by the return." The taxpayer made no such application until nearly two years after the close of the second year—1929—and it is therefore impossible to see what standing it had to vary the "method of accounting regularly employed" by it. This has been the view taken in a number of decisions. Elmwood Corp. v. United States, 5 Cir., 107 F.2d 111; St. Paul Union Depot Co. v. Commissioner, 8 Cir., 123 F.2d 235; Franklin County Distilling Co. v. Commissioner, 6 Cir., 125 F.2d 800; Commissioner v. Saunders, 5 Cir., 131 F.2d 571.

But the claim is without merit anyway. There was no actual "realized" loss in a drum until it was scrapped; so far as appears, it served its purpose quite as well until then, though it would not fetch as much upon a sale. Nevertheless, it is quite true that the law does recognize depreciation not "realized," and treats it as a deductible loss, when in the jargon of the statute, not to do so will "distort," and not "clearly reflect," the income; by which we understand only that it will be

more equitable to allow depreciation. In this case there is no persuasive evidence that annual depreciation would a priori have had such a result: certainly none conclusive enough to justify the Tax Court in overruling the Commissioner. In the end, if the taxpayer had carried out its method of deducting only scrapped or junked drums it would have recovered all its actual losses; the only question is as to whether the distribution of these losses by means of an annual deterioration allowance was so much fairer that the Commissioner had no discretion to refuse it. We do not think that it was. It is true that such an allowance over the years 1922 to 1929 would have been more than three times as great; and that for the years 1928 and 1929 it would have been more than twice as great. This is understandable. The records show only the drums on hand in 1922 at the Peoria plant and these were less than 4,000; but as the number of drums in that plant in 1928 and 1929 was about one half of all the taxpayer's drums, we may suppose that the total number of drums in 1922 was in the neighborhood of 8000. As this number had grown by 1928 and 1929 to over 180,000, there was an inevitable lag between an allowance based upon scrapped and sold drums and a depreciation allowance; indeed, the surprising thing is that more than 34,000 should have been scrapped or sold between 1922 and 1929. But we cannot see why—even if the Commissioner had had the power to allow a change—it was unfair to hold the taxpayer to a method chosen by it, and adapted in the end to allow it all its actual losses. It is not true that the annual loss would have no relation to the annual income. We should assume, at least after the system had been working for ten years, that the mass of drums on hand would always contain the same proportion of aged drums; if so, an increase in business in any year, resulting in a greater average number of trips for each drum, should result in a larger number scrapped. The correspondence would not be close, no doubt, but that is not necessary; all we need find is that the method chosen was not calculated to work out so egregiously to the taxpayer's disadvantage as to force the Commissioner to grant it the favor which it asked. That question was certainly not to be decided because in 1932 the system was forcibly ended, and the loss imposed by the necessity of disposing of all the old drums at once happened to coincide with the depth of the depression.

## Sale of the Agni Motor Fuel Company Stock.

The taxpayer owned all the shares of stock—500—of the Agni Motor Fuel Company. Late in September, 1929, its president, and one, Beim, the president of the Barber Company, began to bargain for the sale of these shares, and the executive committee of the taxpayer's board of directors authorized its officers to sell them. On the thirtieth the Agni directors declared as a dividend all the surplus and undivided profits of that company, and on the first of October, the Barber Company, and the Globe Oil Refining Company, took over "the operating charge" of the Agni Company, though the personnel did not change. The price was fixed on October 18th by telephone, and by a letter written by Beim, who stated that he was setting up the books of his company in accordance with certain schedules, which he included; and that he would make an initial down payment of $150,000 if desired. Since the contract included the real estate on which the Agni Company did business, a survey was necessary to divide it off from real property which the petitioner was to retain. On December 6th, $10,000 more was added to the purchase price to include added real estate; and in the letter in which that was agreed to, Beim stated that the buyer's attorney would be back in ten days, and that they would "then close the deal, if you will forward us a conveyance for the property or possibly that can be included in the contract, in other words, we are all prepared to complete the deal as soon as the necessary papers are forwarded." The taxpayer did forward a contract on the 9th, which Beim acknowledged on the 16th, saying that "with a few minor changes" it would be satisfactory; but that it would save time if the two attorneys would confer in Chicago. They arranged to close the deal on December 30th, but owing to a death in Beim's family, this was postponed until January 2nd; and on January 6th the final redraft was submitted by the taxpayer's attorney, Huff, to the attorney for the buyers, Hubachek. The formal contract was signed on the 15th, and the transaction then went through. The taxpayer treated it throughout as having been concluded in 1929—both on its books and in its tax returns. The Commissioner found that it had been closed in 1929 and that the profit must go into the income of that year; so also the Tax Court found. The question

is whether that should be the year, or the year 1930.

■■ There can be no doubt that the parties supposed that they had concluded a definite bargain in 1929 and acted upon that assumption; but it does not follow that in fact they had done so. Parties must come to an agreement as to all the details, or at least as to all except those without the settlement of which the bargain would nevertheless go through. Although they suppose that they have agreed, if in fact they have not, their supposition will not serve, and they are not bound. In the case at bar the final details were never finally agreed upon in December. For example, on January 6, Huff wrote to Watkins (the taxpayer's accountant) inclosing a copy of what he called the "draft of contract * * * again modified to meet the suggestions of Hubachek when he was last in the office on Saturday, 4th inst." "The method of handling the transaction" was there stated in detail as agreed upon at some undated conference. Huff sent a copy of this letter to Hubachek, saying that "modifications have been made to meet the suggestions contained in your memoranda." Whether that referred to Hubachek's undated memorandum (Ex. 84), does not appear; but plainly some points were still unsettled, which the parties wished to be settled. Hubachek answered Huff on the 8th, saying that he wanted "to examine the Warranty Deed and the conveyance before recording." It is true that the record does not disclose how important these details were, and perhaps, if the Tax Court had made a finding, we should have had to accept it even without evidence. But that court did not do so; it did indeed recite the evidence in detail, but we can discover nothing which can be called a finding except that the seller's directors authorized the sale for "book value," that the buyer confirmed in writing and "took operating charge" and that the exact price was finally agreed upon—all in 1929. This is entirely consistent with the power of either buyer or seller to withdraw, as on the face of the record either could have done. The authorities do not countenance the notion that one may accrue a debt which still remains uncertain in obligation. Certainly we decided nothing of the kind in Commissioner v. Union Pacific R. Co., 86 F.2d 637, and the Supreme Court went much further in Lucas v. North Texas Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668, where indeed every detail had been agreed upon in the earlier year. If the ruling in that case is still to be followed, it would not have been enough, even had all the terms of the contract at bar been finally settled in 1929, for possession, right to possession and title were all to depend upon the payment of the first installment. "Operating charge" was not possession; it meant no more than that the transaction, if finally consummated, should relate back to October 1st. Possession changed when the new personnel was installed in 1930; it was in that year in which the profit should have been charged to income.

### Losses upon Sale or Abandonment of Certain Equipment.

■ The taxpayer in 1929 sold or scrapped certain of its equipment before it had been used for the period of its expected life; this being due to changes in the industry that made it economical or necessary to substitute other equipment in its place. The question thereupon arose what loss it could claim under § 113(a) of the Revenue Act of 1928, 26 U.S.C.A. Int. Rev.Acts, page 380; the bases for that loss being measured by the original cost less salvage and "allowable" depreciation. § 111(b) (2), 26 U.S.C.A. Int.Rev.Acts, page 376. The Commissioner allowed a "straight line" depreciation on each item of property separately; that means that he divided the original cost into as many years as the property would remain in service and deducted that fraction of the cost for every past year. What was left he allowed the taxpayer to deduct as loss—less any salvage, or "amount realized." This reduced the cost much below what was left of it after subtracting the sum of those deductions which had in fact been allowed to the taxpayer for the past years. The Tax Court has found that these past depreciation allowances were calculated in accordance with a "composite rate"; it relied for this upon a stipulation which, as it believed, agreed that the depreciation had been so computed. The taxpayer denies that the Tax Court properly understood the stipulation, and asserts that in fact the depreciation was not computed under a "composite rate," but under what it describes as "a general average over-all rate, not compounded of individual lives or weighted according to costs." In the view we take it will not be necessary to construe the stipulation, or say whether the Tax Court was right, for it makes no difference whether

the deductions were computed under a "composite rate," or a "general average over-all rate,"—whatever that may mean. No matter what the rate actually used, so far as it differed from "straight-line" depreciation, it could not be used after the taxpayer withdrew any part of the equipment before it had lived out its industrial life.

■■ A taxpayer may not reserve any part of the depreciation which is "allowable" in any year; he must submit to a reduction of his cost by the full amount of the depreciation which he could then have taken. United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054; Kittredge v. Commissioner, 2 Cir., 88 F.2d 632. Thus the question is, not what deductions had been in fact allowed in the past, or—what is the same thing—what part of the original cost remained actually unamortized; but what deductions were "allowable": i. e. what deductions the law would have allowed the taxpayer to take, if it had chosen to take them. So far as it did not, it lost them. When deductions are computed under a "composite rate," a group of items is for convenience dealt with as one; and in finding the final fractional coefficient used to calculate the yearly depreciation of each item, it is assumed that all the items will continue in the group during their entire expectancy. If the taxpayer withdraws any item before that time, the past deductions allowed upon its cost cease to be those "allowable," because one of the premises on which they were agreed to be "allowable"—the continuance of the item in the group—is then no longer true. The only "allowable" deduction thereupon becomes the proper deduction, if the item is treated separately. Nor does it make any difference whether some other conventional rate: e. g. a "general average over-all rate," has been applied in the past. So far as the allowances computed by such a rate in the past varied from the "straight-line" depreciation of any particular item, it would seem that that must have been because another expectancy was substituted for that of the particular item. Certainly, if in the case at bar that rate did make this assumption (the retention of all the items for the duration of their industrial life), the taxpayer did not prove it. Indeed it is not easy to see how any "general average over-all rate" could have failed to include such a factor. For these reasons we hold that the depreciation was correctly computed.

A subsidiary question arises over the sale in 1929 of ten tank cars for $1,500 apiece. The depreciation upon these had been figured at an agreed rate in earlier years and the taxpayer had been allowed a corresponding deduction. When they were sold the question arose—under the Commissioner's theory just mentioned—as to the proper aggregate depreciation computed upon them separately. The taxpayer had not however proved their expectancy, relying upon the agreed "average" rate, or "composite" rate. The Tax Court, not knowing the expectancy of the tank cars, assumed that they had an added life of one year after they were sold, under the rule which we laid down in Cohan v. Commissioner, 2 Cir., 39 F.2d 540. This obviously would, and did, result in practically extinguishing the cost altogether, leaving less than $3,000 out of an original cost of over $31,000. Thus the Commissioner found and the Tax Court agreed that the sale resulted in a gain which was set off against losses in that group and in other groups.

■ The first question is whether the set-off was right. The item arises under Art. 4(a) of the amended petition for the year 1929 in which the taxpayer sought relief against an assessed deficiency. Clearly it was proper for the Commissioner to show the sale price of the cars as a means of proving an offset to any depreciation; and this he did show. The taxpayer on the other hand had to show the loss which involved the depreciation. It was moreover permissible, a gain being once proved, to offset it against a loss arising under Art. 4(f) (1) (a) of the petition in which the taxpayer claimed an overpayment. The Commissioner could not indeed increase the deficiency without asserting a claim before the Tax Court, but he could bring the whole account into hotchpot in order to defeat the taxpayer's claims. We are not satisfied however with the computation of the expectancy of the tank cars. It seems to us plain that a car which had cost only $3,000 ten years before, and which sold for $1,500, must have had more than one year's future use in it. To suppose that at second hand it would fetch half its original cost, although it would become useless almost at once, is not tenable on any theory. The case will be sent back for a more liberal allowance, and possibly the Tax Court

will find it desirable in its discretion to admit evidence as to the expectancy of the cars.

### The Commissioner's Appeal.

The Commissioner appeals from the order in so far as they allowed a deduction for payments required by the terms of a contract between one of the taxpayer's affiliates (the return was for an affiliation) and that affiliate's wholly owned subsidiary. The occasion for the contract was that the affiliate, being an American corporation, was not allowed by the Cuban law to own any coastwise shipping; yet it needed such shipping in its molasses business in Cuba. In order to comply with the Cuban law it therefore organized in Cuba a subsidiary, all of whose shares it owned and whose officers were drawn from its own staff. The subsidiary had no independent direction of its own, but in every detail of its activities followed the directions of the affiliate. These two companies entered into a contract by which the subsidiary, as owner of the boats, let them to the affiliate under a written contract, the rent being stated as the "total of all the operating expenses, including depreciation and including any loss by Transporte" (the subsidiary) "through the perils of the seas or inland waters." Although this contract was not executed till 1931, it embodied an earlier oral contract in the same terms. In accordance with it the affiliate credited the subsidiary with $40,000 in 1928 and $60,000 in 1929, as depreciation upon the boats. The taxpayer did not prove any actual depreciation, but insisted that, since the affiliate was to be deemed to have paid the sums mentioned to the subsidiary, it rested upon the Commissioner to impugn the evidence. This view the Tax Court accepted.

■ We cannot agree. We will assume arguendo that payments made in performance of a contract between two separate corporations will, if uncontradicted, support a deduction—not strictly as depreciation, but as an expense of the business. Warrant for so accepting them would in that case be the charterer's interest antagonistic to the owner's; it is not to be supposed that he will pay more than the contract compels him to; if his promise is to pay depreciation, being acquainted with the facts and jealous of his own interest, he will see to it that there has been an actual depreciation up to the amount which he pays. But none of these safeguards exist between a parent and a dummy subsidiary such as went through the form of bargaining in this case. No money can really change hands; and, so far as appears, the bookkeeping could have been cast in any figures agreeable to the parties. To allow such transactions to throw upon the Treasury a duty of disproving their reality, appears to us to accept shadow for substance. The order must be pro tanto reversed, but, since the taxpayer was presumably misled into failing to prove the facts by the Tax Court's acceptance of its legal position, that court may see fit to give it an opportunity to prove that the payments represented actual depreciation; or at least how far they did.

Order affirmed except as to the points mentioned above; as to those it is reversed, and the cause is remanded for further proceedings not inconsistent with the foregoing.