**THRIFTICHECK SERVICE CORPORA-
TION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 192, Docket 26540.

United States Court of Appeals
Second Circuit.

Argued Jan. 6, 1961.

Decided Feb. 16, 1961.

Robert W. Brady, Newark, N. J. (John
T. Powell and Hale & Dorr, Boston, Mass.,
on the brief), for petitioner.

Carolyn R. Just, Department of Justice,
Washington, D. C., (Charles K. Rice,
Asst. Atty. Gen., Lee A. Jackson, Carolyn
R. Just and Robert N. Anderson, Wash-
ington, D. C., on the brief), for respond-
ent.

Before MAGRUDER, WATERMAN
and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This petition for review challenges a
determination of the Tax Court, 33 T.C.
1038, sustaining the Commissioner's dis-
allowance of a deduction for depreciation
of an amount allegedly paid by taxpayer
for customer contracts formerly held by
its predecessor, Bankers Development

Corporation. The facts are fully set forth in Judge Atkins' opinion and we shall here state only those we deem essential.

Bankers, solely owned by Jerome E. Casey, had developed a system for the sale of bank checks known as Thrifti-Check Service Plan. It furnished this to commercial banks throughout the country pursuant to contracts. In April, 1953, Bankers was liquidated. Casey sold the taxpayer the assets that had been used in Bankers' business for $337,503.93. Schedules attached to the contract allocated $290,818.61 of the price to 200 customer contracts; the balance, $46,685.32, represented inventory, office furniture, notes, unearned advances and sales accounts, and a $5,000 item for "Trademark 'ThriftiCheck' and goodwill." The entire price was to be paid by taxpayer's executing a debenture to Casey calling for monthly payments on a declining scale from June 15, 1953 to May 15, 1959, for which the customer contracts and all amounts becoming due under them were assigned as security. Taxpayer also agreed to pay Casey, in consideration of his agreement not to compete, $12,500 annually for life, with payments of half that amount to be made to his executor or widow until April 30, 1963, if he died before then.

The contracts provided that the bank would pay Bankers $1.50 for each account opened under the plan, plus an amount, either 1 cent or 1¼ cents, per check thereafter sold by the bank to its customers; Bankers was to furnish all necessary material and servicing in return. During the life of the contract the bank was not to install or operate any similar checking account plan. Each contract was for a term of five years and was automatically renewed for a like further term unless either party within a stated time before expiration, which varied from three months to a year, gave notice of its election to terminate.[1] The contracts also contained a provision for dis-

continuance by the bank before the end of the contract term. The more recent contracts provided this might be done on any anniversary after the second upon 12 months' prior notice; earlier ones contained a provision similar except that only six months' notice was required; and still older ones provided for cancellation by the bank on six months' written notice at any time.

Barker, who had been president of Bankers and was a member of the group that organized the taxpayer, testified that he had bargained with Casey as to the price of each of the classes of assets to be purchased; that, with respect to the contracts, he determined the number of months of the stated term remaining after April 30, 1953, estimated the average gross income expectable from each contract per month during that period and conferred with his associates "to figure out how much we could afford to pay for each of these contracts"; and that they then discussed this with Mr. Casey, who "through the same procedure" had come up with a figure for the contracts $14,000 higher, which was the amount paid. The evidence does not disclose how either Barker or Casey made the translation from the gross income expectable during the stated terms of the contracts to the purchase price. At the date of the hearing, April, 1959, 35 of the 200 contracts had been cancelled and 68 renegotiated at a lower price. During the same period, 225 new contracts had been made, 12 of which had been cancelled.

Taxpayer's income tax return for the year ended April 30, 1954 showed gross income of $318,318.24 and deductions of $293,078.53, for a net income of $25,239.71. One of the deductions, $119,817.27, was for amortization of deferred contract expense. The Commissioner disallowed this and the proceeding in the Tax Court followed.

The $119,817.27 figure was 41.2% of the amount said to have been paid for the

---

1. The oldest contract annexed to the stipulation seems to continue the automatic renewals indefinitely. However, we read the others as providing only a single automatic renewal.

contracts. This percentage represented the ratio of the estimated income under the contracts for the year ending April 30, 1954 to the total such income estimated, on a sharply descending scale, for the six years ending April 30, 1959. The estimates seem to have borne little resemblance to reality since taxpayer's actual income in the year ended April 30, 1954 was only 56% of that estimated as receivable from the 200 contracts, whereas, on the other hand, 165 of the 200 were still in effect in the year ended April 30, 1959, for which only $3,892.40 was estimated as being receivable. However, this issue was not explored in detail, the taxpayer and the Commissioner having stipulated that "Upon the filing of the opinion of the Court determining the issue in this case, the amount of deduction, if any, allowable as amortization of the said 200 contracts and the loss, if any, sustained by reason of cancellation or change of said contracts which was not claimed on taxpayer's return" was to be computed by the parties and submitted pursuant to Rule 50, Tax Court Rules, 26 U.S.C.A. § 7453. Barker testified that no contracts were cancelled in the year in question.

Section 23(*l*) of the 1939 Code, 26 U.S.C.A. § 23(1) allows as a deduction "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

The Commissioner's interpretation of this as relating to the issue here is found in Treasury Regulations 118, § 39.23 (1)–3, which we quote in the margin.[2]

We assume in taxpayer's favor that contracts for the sale of a taxpayer's products or services may be "property used in the trade or business" or "property held for the production of income." The taxpayer relies on certain early decisions permitting deduction for the amortization of such contracts, Reserve Natural Gas Co. of Louisiana, 1928, 12 B.T.A. 219; Flynn, Harrison & Conroy, Inc., 1930, 21 B.T.A. 285, acquiesced in X–1 C.B. 22; and United Profit Sharing Corporation v. United States, 1928, 66 Ct.Cl. 171.[3] The Commissioner confronts these with the principle, categorically stated in 4 Mertens, Law of Federal Income Taxation § 23.117, p. 232 (1960) with citation of authority, that neither depreciation nor obsolescence is allowable in respect of good will. See also Note, An Inquiry into the Nature of Good Will, 53 Colum.L.Rev. 660, 724–25 (1953), and compare Clarke v. Haberle Crystal Springs Brewing Co., 1930, 280 U.S. 384, 50 S.Ct. 155, 74 L.Ed. 498, with V. Loewer's Gambrinus Brewing Co. v. Anderson, 1931, 282 U.S. 638, 51 S.Ct. 260, 75 L.Ed. 588. The Commissioner relies particularly on decisions disallowing depreciation of the cost of acquiring magazine

---

2. "Sec. 39.23(1)–3 Depreciation of intangible property. Intangibles, the use of which in the trade or business or in the production of income is definitely limited in duration, may be the subject of a depreciation allowance. Examples are patents and copyrights, licenses, and franchises. Intangibles, the use of which in the business or trade or in the production of income is not so limited, will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject

of a depreciation allowance, provided the facts are fully shown in the return or prior thereto to the satisfaction of the Commissioner. No deduction for depreciation, including obsolescence, is allowable in respect of good will."

3. In the last case the Government "practically" conceded that if taxpayer from the outset had kept its books so as to amortize the expenditures, the deduction would have been proper; the controversy concerned the effect of taxpayer's having first claimed the items as expenses. Taxpayer also cites Bernicedale Coal Co., 1929, 16 B.T.A. 696, acquiesced in X–1 C.B. 6, but this involved a contract for the purchase of materials.

and newspaper subscriptions; The Danville Press, Inc., 1925, 1 B.T.A. 1171, and Meredith Publishing Co. v. C. I. R., 8 Cir., 1933, 64 F.2d 890, certiorari denied 1933, 290 U.S. 646, 54 S.Ct. 64, 78 L.Ed. 560 on the basis that such subscriptions constitute a single permanent asset rather than a series of terminable ones, and on this Court's decision in United States Industrial Alcohol Co. v. Helvering, 2 Cir., 1943, 137 F.2d 511, disallowing a deduction for the cost of contracts for the sale of alcohol within the tax year.

The acquisition of the 200 contracts gave the taxpayer numerous benefits, some under and others outside the contracts themselves. The first class included, in relative order of certainty, the assurance that the banks would use taxpayer's services up to the dates as of which the banks were entitled to cancel, the probability that they would continue to use its services through the entire stated terms of the contract, and the likelihood that they would permit automatic renewal to occur. Outside the contracts was the advantageous position in which these placed taxpayer for further business with the contracting banks even after the initial and renewal terms had expired—as well as the benefit of enabling taxpayer to maintain an organization that would result in contracts with other banks, United States Industrial Alcohol Co. v. Helvering, supra, at page 513.

■■ It is manifest that the $290,818.61 paid by the taxpayer reflected all these elements of value, since the small balance of the purchase price included nothing for any of them save the $5,000, nominal under the circumstances, paid for the trademark ThriftiCheck and good will. Plainly the prospect of continued business with the 200 banks after the expiration not only of the initial but of the automatic renewal term had substantial value. Although the record does not give the dates of all the contracts, two of the six stipulated as fairly representing the form of the 200 were more than ten years old at the date of the acquisition, and three others had run over ten years by the date of the hearing. Yet United States Industrial Alcohol Co. v. Helvering, supra, is square authority that a deduction cannot be taken for amounts paid for the likelihood that new contracts would be made with the same buyers and the benefit of continuity, and here no allocation was made as between the part of the $290,818.61 paid for that and the remainder—a fact which on the analogy of the rule with respect to payment of a lump sum for good will and a non-severable agreement not to compete, see 4 Mertens, supra, § 23.68, p. 155 & n. 34; George H. Payne, 1954, 22 T.C. 526; and Ullman v. C. I. R., 2 Cir., 1959, 264 F.2d 305, 307–308, and cases there cited in footnote 3, would be fatal to the depreciation deduction claimed. However, we are not required to place our decision on the ground of failure to allocate the purchase price between one element of value and another. For we think the combination of provisions for premature cancellation and automatic renewals with the history and prospect of relations continuing beyond the ten years of the initial and first renewal terms, which is here presented, precluded any reasonable determination of a period for amortizing the amounts paid. No one of the three periods appearing in the contracts—the period before the bank could cancel, the original term, or the sum of the original and renewal terms—corresponded with that during which taxpayer expected to realize benefits. Compare cases with respect to leases, Bonwit Teller & Co. v. C. I. R., 2 Cir., 1931, 53 F.2d 381, 82 A.L.R. 325, certiorari denied, Bonwit Teller & Co. v. Burnet, 1932, 284 U.S. 690, 52 S.Ct. 266, 76 L.Ed. 582; 379 Madison Ave., Inc. v. C. I. R., 2 Cir., 1932, 60 F.2d 68; Dab v. C. I. R., 2 Cir., 1958, 255 F.2d 788; C. I. R. v. Pittsburgh Union Stock Yards Co., 3 Cir., 1931, 46 F.2d 646; and as to baseball players' contracts, C. I. R. v. Pittsburgh Athletic Co., 3 Cir., 1934, 72 F.2d 883; C. I. R. v. Chicago National League Ball Club, 7 Cir., 1935, 74 F.2d 1010; Helvering v. Kansas City American Association Baseball Co., 8 Cir., 1935, 75 F.2d 600. Neither was there any indication that available data permitted the taxpay-

er to establish an average life span for the contracts, naturally so since even its predecessor's experience would not necessarily be its own. The stipulation postponing computation of any allowable deduction did not relieve taxpayer from the necessity of showing there was some reasonable basis for determining one. Whether, under appropriate methods of allocation or accounting, a deduction might be taken upon cessation of relations with one or more of the banks in question, we do not decide.

Affirmed.