Sam Scalish, et al. [1] v. Commissioner. Scalish v. Commissioner
Docket Nos. 87670-87673.
United States Tax Court
T.C. Memo 1962-46; 1962 Tax Ct. Memo LEXIS 262; 21 T.C.M. (CCH) 260; T.C.M. (RIA) 62046; March 6, 1962
Arlene B. Steuer, Esq., and Michael E. Cozza, Esq., Leader Bldg., Cleveland, Ohio, for the petitioners. William C. Kollas, Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: In these consolidated proceedings, the Commissioner determined deficiencies in income tax for the calendar year 1956 as follows: Docket
Defi-
No.
Petitioner
ciency
87670
Sam Scalish
$4,553.94
87671
Frank and Frances Em-
brescia
2,658.10
87672
John and Tillie Scalish
3,111.77
87673
Milton and Mayme Rock-
man
3,407.69
By agreement of the parties, the only issue remaining for decision is whether the petitioners are entitled to amortize amounts paid to acquire certain vending machine *263 location leases from a competitor. Findings of Fact Some of the facts have been stipulated and are found accordingly. Sam Scalish, Frank Embrescia, John Scalish and Milton Rockman, hereinafter referred to as the petitioners, were equal participants in a partnership known as Buckeye Cigarette Service, hereinafter referred to as Buckeye. Buckeye was established in 1951 and engaged in the business of owning and operating cigarette vending machines placed in various locations in the Cleveland area. Although the business is highly competitive, Buckeye has had substantial gross sales since its inception. The operation of the cigarette vending machine business may be described briefly as follows: The vending machine operator begins by selling to the owner of a business establishment the idea of using cigarette vending machines in the latter's place of business. If the operator succeeds in obtaining the location, he then proceeds to purchase a cigarette vendor's license for the location and to install therein one, or more, fully stocked cigarette machines. The initial cost to the operator of the license, the cigarette machine and the inventory for the machine is approximately $600. *264 If possible, the operator tries to obtain an agreement from the owner of the location that the operator will have the exclusive right to vend cigarettes upon the premises for a specified period of time. These agreements are generally referred to as leases, and while they are in effect the location is secure from the operator's competitors. However, if the lease expires or the location is not under lease, the operator has no protection from competition. Hence, in order to preserve a location, the operator, about 30 to 90 days prior to the expiration of the lease, usually attempts to obtain a new commitment from the owner of the location. The leases are of significant value and are frequently the subject of purchase and sale among the operators. Furthermore, it would be very difficult for an operator to engage successfully in the cigarette vending machine business without the benefit of such leases. The Ace Cigarette Service Company, hereinafter referred to as Ace, at the present time and for some years past, was the owner and operator of cigarette vending machines in various locations in the Cleveland area and a competitor of Buckeye. On May 4, 1955, Buckeye entered into an agreement *265 with Ace under which Ace agreed to sell to Buckeye 228 cigarette vending machines, the retail cigarette licenses applicable to such machines, the inventory of cigarettes and matches contained in the machines, 136 location leases and 43 locations not under lease. The purchase price was allocated as follows: (a) For the vending machines the sum of $44,000.00. (b) For the leases of locations, the sum of $41,926.68. (c) For locations not under lease sum of $4,384.62. (d) For the inventory of cigarettes in the vending machines, the seller's cost thereof at the rate of $90.00 per case for regular packages, $95.00 per case for King Size packages, and $99.00 per case for Filter Tip packages. For the inventory of matches the seller's cost thereof. (e) For the licenses the prorated cost thereof, such proration to be as of the close of business May 6th, 1955. (f) For advanced commissions the prorated amount thereof as of the close of business May 6th, 1955. The agreement also provided, inter alia: For no further or independent consideration, Buckeye agrees that it will not sell cigarettes by vending machines or attempt to sell or solicit such sale in any other location where *266 Ace presently has machines (other than the locations herein being sold) for a period of three (3) years after the date of this agreement, and within the entire area of Cuyahoga County, Ohio. Similarly, Ace agrees that it will not sell cigarettes by vending machines, or attempt to sell or solicit such sale, at any of the locations at which are presently located the machines herein agreed to be sold, for a period of three (3) years from and after the date of this agreement. At the expiration of said three (3) year period, Ace shall have the option to renew the covenant of Buckeye as contained in the foregoing paragraph for a period of two (2) additional years from and after the expiration of said three (3) years upon the payment of additional consideration of One Hundred Dollars ($100.00). Notice of the exercise of such option shall be in writing, delivered by Ace to Buckeye not less than three (3) months prior to the expiration of the original three (3) year period, accompanied by a remittance in said sum of One Hundred Dollars ($100.00). The restriction imposed above on Buckeye shall apply as well to any members of its partnership, and such partners shall join in the execution *267 of this agreement to indicate their willingness to be bound by said restrictions. Similarly, the restriction imposed upon Ace shall apply equally to the stockholders, officers and directors of Ace, and such stockholders, officers and directors shall join in the execution of this agreement to indicate their willingness to be bound by said restrictions. The 136 location leases assigned to Buckeye by Ace were identical in form and differed only with respect to the amount of the advanced commission to be paid to the owner of the location and the amount of commission to be earned per pack by the owner. The leases generally contained the following language: IN CONSIDERATION OF THE SUM OF $ ,o which is to be applied against future commissions at the rate of " per pack and in further consideration that (Operator) agrees to install, operate and service a cigarette vending machine within the premises (Name of location) owned by located at said owner leases space in his premises sufficient to place the machine and agrees that all sales of cigarettes within said premises shall be solely by means of the cigarette vending machine furnished by the (Operator). This contract and lease shall remain *268 in force until such time as the Advanced Commissions have been earned solely through sales from (Operator) Cigarette Machine. In no event shall this contract and lease be for less than three years and in the event advance commissions are earned prior to expiration of such period the commission thereafter earned at the above rate shall be paid monthly, and for the same period thereafter, on same terms and conditions, unless terminated by written notice by either party to the other at least thirty (30) days prior to the end of such contract term. The advanced commissions ranged from $50 to $500 and the commissions per pack ranged from 1/2 to 2 1/4 cents. Many of the leases acquired by Buckeye from Ace were not new or original leases but were leases which had been in existence for at least one term and had been renegotiated. The petitioners and Buckeye filed their respective income tax returns with the district director of internal revenue at Cleveland, Ohio. On the Buckeye partnership return the $41,926.68 allocated to the location leases by the purchase agreement was treated as a leasehold expenditure amortizable over a 30-month period. That period was to commence May 1955. The *269 sum of $16,770.72 was deducted from partnership income as amortization, thereby reducing the ordinary income of the partnership to $54,886.04. On Schedule H of their individual returns for 1956, each of the petitioners reported income from Buckeye in the amount of $13,721.51 (one-fourth of $54,886.04). In the deficiency notice to each of the petitioners the Commissioner, in addition to the items which are no longer in contest, disallowed the amount of $16,770.72 as a deduction from partnership income, with the following explanation: "The amount of $16,770.72 which was claimed for amortization of leasehold expenditures has been determined to represent amortization of goodwill, for which no deduction is allowable." This adjustment resulted in increasing each petitioner's share of distributable partnership income by $4,192.68. Opinion The issue here involves the correctness of respondent's adjustment disallowing the amortization deduction claimed by the partnership in computing its 1956 partnership income. The petitioners contend that the amount paid to acquire the leases represents the cost of acquiring a property right and that such cost is properly amortizable over the life *270 of the lease. [2] The respondent, in addition to the reason cited in the deficiency notice, now contends, in the alternative, that the leases transferred by the agreement of May 4, 1955, are of such an indefinite character that no probable useful life can be determined; consequently, no amortization is possible. The respondent's alternative argument was mentioned for the first time in respondent's opening statement. Although respondent did not file an amended answer, counsel for the petitioners neither objected nor claimed surprise at the hearing. Furthermore, petitioners' counsel dealt with the matter both during the hearing and on brief as though it were in issue. In view of these circumstances, *271 we are of the opinion that the respondent's alternative argument is properly before the Court and may be considered as a possible basis for denying the claimed deduction. Standard Oil Co., 43 B.T.A. 973 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942), certiorari denied 317 U.S. 688 (1942), rehearing denied 319 U.S. 784 (1943); Bard-Parker Co., 18 T.C. 1255, 1259 (1952), affd. 218 F. 2d 52 (C.A. 2, 1954), certiorari denied 349 U.S. 906 (1955); A. Finkenberg's Sons, Inc., 17 T.C. 973, 980 (1951); Joseph L. Merrill, 9 T.C. 291, 296 (1947), affd. 173 F. 2d 310 (C.A. 2, 1949); Hilbert L. Bair, 16 T.C. 90, 98 (1951), affd. 199 F. 2d 589 (C.A. 2, 1952). For reasons which will shortly become apparent, we will consider first respondent's alternative argument, i.e., that the useful life of the location leases was indefinite and incapable of being estimated with reasonable certainty. This Court on numerous occasions has recognized that *272 an allowance for depreciation or exhaustion is proper with respect to intangible assets employed in a business where their remaining useful life is definitely limited and ascertainable. General Equipment Co., 2 B.T.A. 804, 811 (1925); Western Valve Bag Co., 13 B.T.A. 749, 751 (1928); Flynn, Harrison & Conroy, Inc., 21 B.T.A. 285 (1930); Keokuk and Hamilton Bridge, Inc., 12 T.C. 249, 263 (1949), reversed on other grounds 180 F. 2d 58 (C.A. 8, 1950); C. E. Silling, Sr., 27 T.C. 701, 706 (1957). See also section 1.167(a)-3, Income Tax Regs. Furthermore, in considering whether a particular asset had a determinable useful life, this Court has observed that certain mass assets tend to have a value which does not decrease by the passage of time alone. The Danville Press, Inc., 1 B.T.A. 1171 (1925), 9000 newspaper subscriptions; Richard M. Boe, 35 T.C. 720 (1961), now on appeal, 8984 medical service contracts; Meredith Pub. Co. v. Commissioner, 64 F. 2d 890 (C.A. 8, 1933), affirming Successful Farming Publishing Co., 23 B.T.A. 150 (1931), *273 certiorari denied 290 U.S. 646 (1933), magazine circulation structure; Westinghouse Broadcasting Co., 36 T.C. 912 (1961), 183 spot advertising contracts; Thrifticheck Service Corporation, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961), 200 customer contracts. It is true the value of the mass asset may fluctuate from time to time as contracts, lists or subscriptions gradually expire and are replaced by new ones. However, this is generally regarded not as a process of exhaustion, but rather as a process by which a continually existing asset is kept intact. Thus, the mass asset is frequently held to have an indeterminate useful life and, consequently, to be not depreciable. Metropolitan Laundry Co. v. United States, 100 F. Supp. 803 (D.C. Cal. 1951); Westinghouse Broadcasting Co., supra. It, therefore, becomes appropriate to consider first whether Buckeye's purchase of 136 location leases constituted the acquisition of 136 disconnected assets or the acquisition of a single mass asset, and second, whether such assets or asset did, in fact, have a determinable useful life. The record discloses *274 that the agreement of purchase and sale merely provided that the sum of $41,926.68 was to be paid "For the leases of location;" nowhere in the agreement were the individual leases assigned a separate value or treated as separate items of the transaction. Furthermore, at the hearing of this case the petitioners offered no evidence either as to how the aggregate price of $41,926.68 was actually arrived at by the parties to the sale or as to whether the leases were intended to be acquired and held as individual assets. It is also worthy of note that Buckeye did not seek to amortize the pro rata cost of each lease over its individual remaining term but chose to amortize the entire purchase price over a 30-month period commencing May 1955, a factor in and of itself tending to indicate that Buckeye considered the 136 leases to be a single asset. Finally, we are unable to find a significant distinction between subscription lists, customer service contracts, spot advertising contracts, etc., and the location leases involved herein. In each case the asset constituted all or a portion of the sales or customer structure of a business enterprise. Accordingly, we hold under such circumstances that *275 Buckeye's purchase of 136 location leases is to be treated as the acquisition of a single asset. We must now consider whether this particular collective asset had a determinable useful life. There is no doubt that the acquisition of the location leases provided Buckeye with an assured market for its cigarettes until the end of the lease term. However, other advantages were obtainable by possession of the location leases. First, the location leases afforded Buckeye continuity of sales and income and thereby enhanced its ability to continue operations. Second, Buckeye obtained an advantageous position for acquiring additional location leases and for maintaining its position with those locations already under lease. In fact, the witnesses testified that it was common practice in the trade for the operator to contact the location owner between 30 and 90 days prior to the expiration of the term in an attempt to obtain another lease. Such advantages or benefits have an indeterminate useful life. United States Industrial Alcohol Co. v. Helvering, 137 F. 2d 511 (C.A. 2, 1943), affirming this issue 42 B.T.A. 1323 (1940); Herbert M. LaRue, 37 T.C. - (October 16, 1961); *276 Thrifticheck Service Corporation, supra. Aside from these inexhaustible benefits, another factor in this case tends to impede a finding that the leases had a determinable useful life. Under the provisions of the leasing agreement, it was possible for the location leases to be extended indefinitely. The presence of such an automatic renewal provision is to be considered when making a determination as to a period of useful life. Thrifticheck Service Corporation v. Commissioner, 287 F. 2d 1 (C.A. 2, 1961); Westinghouse Broadcasting Co., supra. See and cf. Morris Nachman, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951). In view of the foregoing, we conclude that the purchase of 136 location leases constituted the acquisition of a mass asset having an indeterminable useful life. This holding makes it unnecessary to determine whether the cost of these location leases should be allocated in whole or in part to goodwill. Because of stipulated concessions by both parties regarding other adjustments, Decisions will be entered under *277 Rule 50. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: Frank Embrescia and Frances Embrescia, Docket No. 87671; John Scalish and Tillie Scalish, Docket No. 87672; Milton Rockman and Mayme Rockman, Docket No. 87673.↩
2. As an alternative contention, the petitioners' counsel in her opening statement also claimed that at least a part of the amount paid for the location leases should be allocated to Ace's noncompetitive covenant and that as a result this sum would be amortizable over the period of the covenant. Since petitioners' brief contains no further reference to or argument in support of this alternative contention, we have considered the argument as having been abandoned by the petitioners.↩