Daniel J. Klein and Hortense C. Klein v. Commissioner.
Klein v. Commissioner
Docket No. 4623-63.
United States Tax Court
T.C. Memo 1965-207; 1965 Tax Ct. Memo LEXIS 124; 24 T.C.M. (CCH) 1082; T.C.M. (RIA) 65207; July 27, 1965
Isadore Nathanson, for the petitioners. Stephen M. Miller, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years ended October 31, 1960 and 1961, in the amounts of $8,276.44 and $18,845.94, respectively, and an addition to the tax under the provisions of section 6651(a) of the Internal Revenue Code of 1954 for the taxable year ended October 31, 1961, in the amount of $3,469.20. The parties have disposed of certain issues *125 raised in the pleadings prior to trial, and respondent conceded the addition to tax issue on brief. The remaining issue for decision is whether certain contracts constitute goodwill for which no depreciation may be taken or, in the alternative, whether the useful lives of such contracts could be estimated with reasonable accuracy, thus making such intangible assets the subject of a depreciation allowance. Findings of Fact Some of the facts have been stipulated and as stipulated are incorporated herein by this reference. Petitioners, Daniel J. Klein (hereinafter referred to as petitioner) and Hortense C. Klein, filed joint Federal income tax returns for the taxable years ended October 31, 1960 and 1961, with the district director of internal revenue, New York, New York. Petitioner is in the business of furnishing exterminating services, with office located at 366 Madison Avenue, New York, New York. Said business is a sole proprietorship which maintains its books on an accrual basis of accounting. Petitioner has been in the exterminating business for approximately 30 years. In 1940 petitioner began to acquire new business (customer accounts) by purchase from other exterminating *126 companies. The following schedule shows the dates of purchase and number of customer accounts purchased by petitioner from other exterminating companies relating to the years in issue: Date Ac-
No. of Ac-
Name of Exter-
quired
counts
minating Co.
Aug. 1953
Unknown
Pronto Exterminat-
ing Co.
Nov. 1953
296
Commonwealth Sani-
tation Co. of New
York
Jan. 1954
80
Midwood Exterminat-
ing Co.
June 1957
107
Scientific Exterminat-
ing Co.
May 1959
320
Kingsboro Extermi-
nating Co.
Aug. 1960
460
New York Extermi-
nating Co.
Sept. 1960
730
National Exterminat-
ing Co.
Mar. 1961
134
Excellent Extermi-
nating Co.
In several of these transactions petitioner acquired the trade names and "covenants not to compete" from the selling parties. In each purchase transaction, the total price paid by petitioner for each group of accounts totalled the sum of the monthly billing of each customer, multiplied by a particular dollar amount in each over-all contract. Petitioner's exterminating business was principally conducted under the name of Allied Exterminating Co. (hereinafter referred to as Allied). In addition, *127 petitioner serviced and billed accounts under trade names which were acquired in the above-mentioned account purchases. Petitioner maintained records of the monthly number of accounts serviced (or the monthly billings) for each of the separate groups of customer accounts which were purchased in the above-mentioned transactions. Such records indicate a gradual drop-off of customers acquired in these purchases. However, petitioner has no records of the monthly number of accounts serviced or the monthly billings prior to November 1958 for Commonwealth Sanitation Co. and Midwood Exterminating Co. or prior to November 1959 for Scientific Exterminating Co. In addition, petitioner has no records with respect to the accounts purchased from Pronto Exterminating Co.
Petitioner hoped and expected that the accounts purchased would remain his customers. The various individual accounts which petitioner acquired were month-to-month accounts, automatically renewable and terminable upon notification to petitioner if his exterminating services were no longer desired. Such accounts could discontinue petitioner's services for a period of time and thereafter return as a customer. There was no minimum *128 or maximum service which petitioner was under obligation to perform. The amount and type of service was dependent upon the desire of the customer. Petitioner did not have any agreements with the accounts acquired as to the length, type, or amount of services to be rendered. Prior to 1952 petitioner depreciated the cost of the contracts entered into for the acquisition of the various accounts over a period of 36 months. For the year 1952 and subsequent thereto, petitioner depreciated the cost of all such contracts, whereby various service accounts were acquired, over an 80-month period. This change in rate resulted from an extensive detailed audit by an internal revenue agent. Petitioners claimed as deductions in their Federal joint income tax returns for the taxable years ended October 31, 1960 and 1961, depreciation (or amortization of contracts) in the amounts of $6,595.89 and $16,406.81, respectively. Respondent disallowed both these amounts in full on the ground that no competent evidence or appropriate information was submitted in substantiation thereof. Opinion The sole remaining issue involves the correctness of respondent's adjustment disallowing the depreciation (or *129 amortization) deductions claimed by petitioners in the taxable years 1960 and 1961. Petitioner contends that the customer accounts in issue were separate, individual intangible assets having a definite useful life and which could be depreciated (or amortized) over such term. Petitioner relies on sec. 1.167(a)-3, Income Tax Regs.[1]
Respondent takes the position that the principal assets of value acquired were customer lists, tantamount to goodwill and and therefore not subject to depreciation or amortization, *130 or, in the alternative, that each group of accounts purchased was a single, indivisible asset whose useful life was indefinite and incapable of being estimated with reasonable certainty. For reasons which will shortly become apparent, we will consider first respondent's alternative argument. It therefore becomes appropriate to determine (1) whether petitioner's several acquisitions of accounts in question constituted the acquisition of 2,127 disconnected accounts or the acquisition of a single asset, and (2) whether such asset or assets did, in fact, have a determinable useful life. We believe that each group of accounts acquired by petitioner from the various vendors constitutes a single, intangible asset, to wit - a customer list. Cf. Thrifticheck Service Corporation, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961). The fact that the total price paid for each group of accounts totalled the sum of the monthly billing of each customer, multiplied by a particular dollar amount in each over-all contract, does not make each individual customer's account a separate unit or asset. Anchor Cleaning Service, Inc., 22 T.C. 1029 (1954). *131 Petitioner has not shown that any attempt was made to value the accounts individually nor has petitioner shown anything else to indicate that each group of accounts was other than a collective, single asset. It is our opinion that the base thus employed was merely a formula for determining the total price to be paid. Anchor Cleaning Service, Inc., supra.
We must now determine whether these collective or mass assets had reasonable, ascertainable useful lives. This Court on numerous occasions has recognized that an allowance for depreciation or exhaustion is proper with respect to intangible assets employed in a business where their remaining useful life is definitely limited and ascertainable. General Equipment Co., 2 B.T.A. 804, 811 (1925); Western Valve Bag Co., 13 B.T.A. 749, 751 (1928); Flynn, Harrison & Conroy, Inc., 21 B.T.A. 285 (1930); Indiana Broadcasting Corporation, 41 T.C. 793 (1964), on appeal (C.A. 7, Aug. 10, 1964). However, when confronted with this issue regarding mass assets of the variety involved herein, this Court has consistently held that such intangible assets are not subject to an allowance *132 for depreciation because they do not have determinable useful lives. Westinghouse Broadcasting Co., 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963); Richard M. Boe, 35 T.C. 720 (1961), affd. 307 F. 2d 339 (C.A. 9, 1962); Thrifticheck Service Corporation, supra. It has been observed that mass assets generally tend to have a value which does not decrease by the passage of time alone. Westinghouse Broadcasting Co., supra. Petitioner recognizes the indisputable fact that the various customers which he acquired by "purchase" were only on a month-to-month basis, terminable or renewable "at will," and lacking in any fixed payment schedule. However, petitioner goes on to argue that, based upon actual experience, he is able to estimate reasonably how many customers will be lost over a period of time under each contract. Nevertheless, petitioner has not shown any facts sufficient to prevent application herein of what might be termed the "indivisible asset rule." The evidence does not support a finding that the individual groups of accounts have determinable *133 useful lives or that they are in any way distinguishable from those assets in cases where the "indivisible asset rule" has been applied. Westinghouse Broadcasting Co., supra; Richard M. Boe, supra; and Thrifticheck Service Corporation, supra.We are convinced that the 2,127 accounts in question constitute mere customer lists. Thrifticheck Service Corporation, supra. One fallacy in petitioner's argument is that deductions for these "terminations" were taken in the taxable year 1960 and 1961, whereas the statistics he uses to establish "reasonable life" cover the period 1958 through October 1964. We note that, "Depreciation, by its very nature, is the estimate of future events distilled from the prologue of history." Indiana Broadcasting Corporation, supra, at 810. Petitioner had no records at all prior to November 1958, nor did he introduce any other data or records which would tend to establish an experience factor. Petitioner has failed to convince us that the assets in question decrease in value by the passage of time alone. Even if a certain customer decided not to use petitioner's services for one month, or *134 any other period of time, petitioner certainly did not put himself in a position whereby he was unable to solicit or serve such customer should they later decide to return to him. He could restore them to his customer list (Allied's or any other which he used for billing) and begin servicing them anew. Furthermore, we note that diverse factors, such as quality of service, pricing and competition, play a more decisive role in the termination of individual customer accounts than the mere passage of time. Petitioner relies principally upon the decision of this Court in Indiana Broadcasting Corporation, supra. There the taxpayer acquired the network affiliation contracts of two television stations as part of the total assets acquired. The two contracts were for two-year terms, automatically renewable for successive two-year terms unless either party gave written notice of intent not to renew. The taxpayer introduced statistical data and analyses of all the network affiliation contracts from the beginning of the television industry which were used as past experience for preparation of life expectancy and calculation of average contract life. This Court held that this was *135 sufficient evidence of general industry experience over 15 years to establish the average useful lives of the network affiliation contracts with "reasonable accuracy." It is our opinion that Indiana Broadcasting Corporation, supra, is distinguishable on its facts from the instant case. That case involved a single affiliation contract with the network itself and not a collection of individual contracts between the taxpayer and myriad parties. This Court in Indiana Broadcasting Corporation carefully distinguished the facts therein from the type of situation presented in the case at bar, stating at p. 808: This single contract is totally unlike the case of a mass of contracts with a number of customers, which are in a constant state of flux * * * In view of the foregoing, we conclude that the purchase of 2,127 customer accounts in various lots constituted the acquisition of several mass or collective assets having an indeterminable useful life. This holding makes it unnecessary to determine whether the cost of these customer accounts should be allocated in whole or in part to goodwill. With regard to petitioner's argument that he purchased the assets in question relying *136 on the prior allowance of the depreciation deduction and the change from a 36- to an 80-month life following an audit, it is well settled that prior returns accepted as filed do not place a stamp of approval on taxpayer's treatment of an item, and the Government is not later precluded from challenging such treatment. Photo-Sonics, Inc., 42 T.C. 926, 935 (1964), on appeal (C.A. 9, Jan. 12, 1965). Thus, we find for respondent. Decision will be entered under Rule 50. Footnotes
1. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation.no allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *↩