F. W. DRYBROUGH AND ESTATE OF MARION S. DRYBROUGH, DECEASED, CITIZENS FIDELITY BANK & TRUST COMPANY, EXECUTOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 605–63.   Filed February 15, 1966.

*Rucker Todd* and *John T. Bondurant*, for the petitioner.
*S. Earl Heilman*, for the respondent.

FORRESTER, *Judge:* Respondent determined deficiencies in the income tax of the petitioners for the years and in amounts as follows:

| Year | Deficiency |
| --- | --- |
| 1959 | $88, 304. 48 |
| 1960 | 121, 379. 80 |

Some of the matters at issue have been conceded by the parties, leaving for our consideration the following: (1) What was the fair market value of the furniture, fixtures, and equipment sold by F. W. Drybrough (hereinafter referred to as the petitioner) on March 2, 1959, to the purchasers of his sole proprietorship; (2) is the petitioner bound by the contract price of $395,000 specified for the asset known as the white files, and did such price include an allowance for the goodwill, if any, of the business; (3) was the gain on the sale of the assets known as the gold files and the green files a capital gain or ordinary income?

#### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

F. W. Drybrough and Marion S. Drybrough filed timely joint Federal income tax returns for 1959 and 1960 with the district director of internal revenue at Louisville, Ky. Before the petition was filed with the Court in the instant case, Marion S. Drybrough died. Citizens Fidelity Bank & Trust Co. is the duly appointed and acting executor of her estate. F. W. Drybrough will hereinafter be referred to as petitioner.

In 1917 the petitioner organized a Kentucky corporation, United Mercantile Agencies (hereinafter referred to as Old UMA), to engage in a general collection agency business. By the 1930's the firm specialized in the handling of claims for manufacturers and also operated a small credit-reporting agency for the beverage industry. The petitioner was the majority stockholder of this corporation.

The corporation was liquidated on May 31, 1955, and the petitioner acquired all of its assets. He then operated the same business as a sole proprietorship under the name United Mercantile Agencies (hereinafter referred to as UMA). Late in 1958 the petitioner decided that because of his advancing age and because he wanted to devote more time to other ventures, he would sell his collection agency business.

The petitioner selected five important employees of UMA as prospective purchasers of the business and at the beginning of negotiations with them, he offered to sell for $1 million. The five men were intensely interested but not at that price. The petitioner and the purchasers bargained over a period of 3 to 4 months and during at least 10 separate meetings. Each asset was discussed separately, and the negotiations were serious and bona fide. Goodwill of the business was not specifically discussed.

The parties finally agreed upon a total price of $877,500. The five men formed a Kentucky corporation, United Mercantile Agencies, Inc. (hereinafter referred to as UMA, Inc.), to act as the purchasing entity. On February 28, 1959, the petitioner and UMA, Inc., entered into a contract (hereinafter referred to as the agreement) whereby the petitioner agreed to transfer to UMA, Inc., on March 2, 1959, all of his rights and interests in the following assets: "(a) The White Files, (b) the Green Files, (c) the Gold Files, (d) the Beverage Files, (e) the Accounts Receivable, and (f) the Furniture and Fixtures." By this agreement the parties intended to, and did, transfer the entire going business [1] which petitioner had been conducting. Petitioner executed a bill of sale on March 2, 1959, making the agreed transfer.

---

[1] Including $7,000 worth of stationery and general office supplies, the cost of which had been expensed.

The agreement allocated the purchase price among the assets as follows:

| | |
|---|---|
| White files | $395,000 |
| Green files | 52,500 |
| Gold files | 245,000 |
| Accounts receivable | 35,000 |
| Beverage files | 10,000 |
| Furniture and fixtures | 140,000 |
| Total | 877,500 |

The purchase price was paid in installments, and the petitioner and Marion Drybrough elected to report by the installment method the amounts paid to him under the agreement. This method is not questioned. In 1959 petitioner received $244,782.32 pursuant to the sale and in 1960, $361,781.32. In their joint Federal income tax returns for the years in issue, the petitioner and his wife treated all of their profit on the sale as capital gain. In his statutory notice of deficiency the respondent determined that all of the gain except that realized in connection with the furniture and fixtures was properly reportable on the installment basis as ordinary income.

The respondent has since conceded that the respective gain and loss on the Beverage Files and the accounts receivable were capital. The respondent also accepts the values assigned to the individual assets in the agreement except for the $140,000 assigned to furniture and fixtures. At issue is the fair market value of the furniture and fixtures at the time of the sale and the character of the gain on the sale of the gold files, green files, and white files.

### Furniture and Fixtures

The asset, labeled "Furniture and Fixtures" by the parties and sold by the petitioner to UMA, Inc., on March 2, 1959, consisted of desks, chairs, other furniture, dictaphone equipment, typewriters, adding machines, bookkeeping machines, and miscellaneous office equipment. This property was in very good condition at the time of the sale. The fair market value of this asset at the time of the sale was $61,426.40.

All of the office equipment included in this asset was more than 6 months old except for a few items which had been purchased early in 1959. The original cost and the fair market value of these items at the time of the sale was $1,224.

### Gold Files and Green Files

One of the assets (the gold files) covered by the agreement was a group of 50 claims which had been assigned or transferred to Dry-

brough and which he owned. The name resulted from the practice of the petitioner in keeping the papers relating to these claims in yellow manila folders. The claims contained in these files were of the highest quality, they included contract rights, first and second mortgages, judgments, capital stock, and receiver certificates, along with correspondence, memoranda, and other writings relating to collection.

Some of the gold files covered by the agreement had been purchased by Old UMA. The petitioner acquired those gold files when the corporation was dissolved on May 31, 1955. After the dissolution of Old UMA, the petitioner bought additional gold files, but none of these purchases took place within 6 months of February 28, 1959.

On February 28, 1959, the face value of the claims in the gold files totaled $286,055.25. Some of these claims bore interest, and at the time the agreement was signed the accrued interest totaled $4,689.34. It is stipulated that $245,000 was fairly allocable to the gold files transferred by the petitioner to UMA, Inc. Of this $245,000, $3,951.61 is properly allocated to accrued interest.

UMA, Inc., also bought from the petitioner a group of 153 claims known as green files. This name resulted from the practice of the petitioner in keeping the related papers in green manila folders. These claims, like the gold files, were owned by Drybrough but they were of very poor quality. Of the 153 green files covered by the agreement, 89 were uncollected judgments, 12 were delinquent open accounts, and 8 were claims against bankrupts. Some of these claims bore interest, and on most of them there was accrued but unpaid interest when they were purchased, but the agreement did not attempt to determine what part of the aggregate value of the green files was attributable to accrued interest.

Of the 153 green files sold under the agreement, all but 10 had been held by the petitioner for more than 6 months; these 10 files had an aggregate face value of $14,478.09, and none of them was sold at a gain. The total face value of green files sold under the agreement was $197,882.96. It has been stipulated that $52,500 was fairly allocable to the green files sold under the agreement.

The petitioner had never sold any green files before the sale in question. On two occasions before 1950 the petitioner had sold groups of gold files.

During the time the petitioner operated the business as a sole proprietorship, he deducted currently the cost of collecting on the gold and green files, however, his accounting system did not segregate the expense of collecting on either of these types of claims from the other

expenses of the business. Under his accounting system no profit or income was reported on collections on the gold and green files until their cost had been recovered in full. When their cost had been recovered, all income thereafter was reported as ordinary income.

On March 2, 1959, the petitioner's unrecovered cost on the gold files acquired by him on the liquidation of Old UMA in 1955 was $61,102.74. His unrecovered cost on the green files acquired on the same liquidation was $20.62. On March 2, 1959, the petitioner's unrecovered cost on the green and gold files acquired by him during the period from May 31, 1955, to February 28, 1959, was $73,860.67.

### White Files

The most important part of UMA's and of petitioner's business was the collection of claims for others on a contingent fee basis. When a delinquent account was sent in by a manufacturer for collection, the claim became the subject of a white file, so-called because the papers relating to the claim were kept in a white manila folder. These claims were processed in a very systematic way. The claim went from the mail department to the docketing department, and a docket card was prepared. Then it was checked against debtor index cards and an index card was made up if one was not already in existence. A white file jacket was prepared and pertinent information to help collect the account was noted on the outside of this jacket. As efforts were made to collect the account, additional information was recorded on the jacket.

A new white file jacketed claim would go to the adjustment department. The personnel of this department would try to collect the claim or get security for it by letters or a telephone call. There were also two traveling adjusters to contact the debtors on large claims.

If collection was not made by the adjustment department, the claim went to the attorney department. The personnel in that department sent the account to an attorney near the debtor to attempt a collection. The owner of the claim advanced estimated court costs to the petitioner, and he in turn advanced them to the attorney.

At no time during the collection process was there a written contract between the owner of the claim and the petitioner, and the creditor retained ownership of the claim. The petitioner's fees were entirely contingent, and he earned no fee unless he made a collection. The creditor was free to withdraw the claim from the petitioner's possession at any time before collection.

On March 2, 1959, the petitioner had 6,808 open white files. Of this total there were 1,429 files in the adjustment department with a face value of $1,495,481.35 and 5,379 files in the attorney department having a face amount of $5,356,770.30.

On the basis of past experience it was reasonably predictable that the gross and net contingent fees to be realized on these choses in action would be approximately 12 and 6 percent, respectively, of the face amount of the claims. Since the face amount of the white file claims on hand at the time of sale was about $6,850,000, the projected fees to be earned were about $411,000. As noted, the agreement allocated $395,000 for the white files.

When Old UMA was dissolved in 1955, the petitioner acquired for no consideration the white files then in the company's possession and showing a face amount of about $5 million. The petitioner treated these files as a capital asset having a value of $300,000 and paid a tax on a capital gain in that amount. Between May 31, 1955, and March 2, 1959, the petitioner had recovered $274,555.85 of his basis in this asset and therefore had an unrecovered cost basis of $25,444.15 therein.

### OPINION

The first issue concerns the fair market value of the furniture, fixtures, and equipment at the time it was sold to UMA, Inc. It is agreed that this aggregate item is a capital asset, and that any gain on its sale is a capital gain. It is further agreed that the price of $140,000 assigned to this asset by the agreement is unrealistic. However, the parties are in sharp dispute as to the fair market value of this property at the time of its sale. The respondent has determined the value to be $40,000. The petitioner argues for, and we think the evidence has established, a fair market value of $61,426.40.

The agreement of February 28, 1959, was intended to, and did, cover the entire, going, collection agency business, but its terms referred to certain specified assets, and each asset had an individual value assigned to it. The respondent has accepted all of the assigned values except that accorded to the asset, "Furniture and Fixtures." The agreement values this asset at $140,000 which inflated value would give petitioner an unduly high ratio of the total sale proceeds as long-term capital gain, and if used by the vendee, would afford an unfairly high basis for depreciation. In such a situation the respondent is free to disregard the value stated in the contract in order to prevent tax avoidance. *Copperhead Coal Co.* v. *Commissioner*, 272 F. 2d 45 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court; *Meister* v. *Commissioner*, 302 F. 2d 54 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court.

It falls to us to determine the fair market value of this asset at the time of the sale. We need cite no authority to define fair market value in these circumstances as the price well informed and willing buyers and sellers would agree upon, dealing at arm's length, with neither acting under any compulsion to buy or sell.

It was agreed by stipulation that the petitioner's unrecovered cost of this property for depreciation purposes on March 2, 1959, was $28,714.23. The respondent argues that a fair market value of $40,000 is reasonable because the original cost of all the property was $56,284.89, taking this figure from the depreciation schedule attached to the petitioner's Federal joint income tax return for 1959. In this case the schedule is not a reliable source of original cost because it includes only property that had not been fully depreciated. In fact some of the property in issue had been fully depreciated, and in addition, some of the items were bought used in 1955, and their original cost does not appear in the schedule. The petitioner's original cost of this property was in fact more than $90,000.

To sustain his burden of establishing the fair market value of the property the petitioner produced four expert witnesses. Without exception their qualifications were impressive and their testimony credible and to the point. Each of the witnesses described the condition of those portions of the property which were his specialty and gave his opinion of its fair market value. None of the witnesses based his valuation on replacement cost. Respondent contented himself with cross-examination of these same witnesses.

We find the March 2, 1959, fair market value of the asset labeled "Furniture and Fixtures" to be $60,202.40,[2] and assign that amount out of the total consideration of $876,276 [2] to this item. It follows that the difference between this amount and petitioner's depreciated base of $27,490.23 [2] is taxable to petitioner (on the installment basis) as long-term capital gain.

Respondent has conceded on brief that any "surplus" amount (now held to be $78,573.60) assigned to this item by the agreement may be taxed to petitioner, in installments, on the long-term capital gain basis as if paid for goodwill. Respondent also contends that the $7,000 worth of supplies which were acquired by UMA, Inc., should be considered as a gift, since they were not specifically mentioned in the agreement. Petitioner, more realistically, contends that the supplies were a part of the furniture and fixtures item, but concedes that this $7,000 gain should be taxed to him as ordinary income. Respondent does not object to this result, consequently, we approve such treatment, which reduces the above "surplus" amount to be taxed as a long-term capital gain to $71,573.60.

The second issue is whether the price of the white files, as bargained for by the parties and as specifically set out in the agreement, should

---

[2] Some office equipment was bought during the first 2 months of 1959. The petitioner's witnesses valued this equipment at $1,224, its original cost, and the parties are agreed that none of the gain on the sale of the furniture and fixtures is attributable to this equipment held for less than 6 months. It follows from this agreement that in computing petitioner's tax liabilities, such amount ($1,224) must be subtracted from all involved amounts.

control for Federal income tax purposes. The petitioner argues that the sale of the white files amounted to the sale of part of the goodwill of his business because the white files included papers and memoranda helpful in collecting the claims, and further, that the white files were a single mass asset having a value equal to the difference between $877,500 and the fair market value of all the other assets. The respondent denies the right of the petitioner to change the assigned agreement price of the white files for income tax purposes and denies that the business had any goodwill or that any was transferred under the agreement. We agree with respondent that the agreement price of $395,000 assigned to the white files cannot be changed under the facts of this case.

In order to fully understand the other questions which are thus presented relative to the white files it is helpful to review the prior proceedings which have been had in this Court regarding the business activities carried on, and transactions had, concerning said files by petitioner and his (for all practical purposes) wholly owned corporation.

Such corporation (Old UMA) and petitioner have, seriatim, carried on the identical business, i.e., that of a collection agency which (as regards such white files) attempted to collect as agent for the owners, delinquent accounts receivable owed to them. These clients were principally manufacturers and large concerns with their own credit departments, which after exhausting their own collection resources forwarded the claims to petitioner or his corporation for collection on a strictly contingent fee basis. Unless and until a collection were effected the agent had no right to any compensation and the owner of the delinquent account (the client) had the right to terminate the agency and repossess his claim or delinquent account at any time before actual collection, in which event no fee or remuneration of any kind was due to the agent.

In 1955 petitioner was operating this collection agency in corporate form. At that time the corporation (Old UMA), had approximately 7,000 such white files on hand with a total face value of approximately $5 million.

Petitioner and his wife owned 373 of the corporation's outstanding 375 shares of stock and in May 1955, the corporation adopted a plan of total liquidation and dissolution calling for the distribution on May 31, 1955, pro rata, to its shareholders of all of its assets. Petitioner agreed to pay cash or its equivalent to the other shareholders for their shares of such assets and such agreement was accepted.

On May 31, 1955, the contemplated distribution and complete liquidation were made and effected. Some cash was retained for payment of outstanding corporate obligations which were shortly satisfied and

a final undisputed accounting was soon thereafter made between the corporation and petitioner.

The corporation had never owned any of the claims or accounts subject of the white files and for that reason it had never allocated or recorded on its books any value attributable to them. No written or formal conveyance or assignment of the white files was made to petitioner but they were located on the premises which had been occupied by the corporation and which was owned by petitioner, and he simply took physical possession of them on June 1, 1955, and continued the identical collection efforts as to them which the corporation had been making.

In petitioner's 1955 Federal income tax return he reported receipt of these white files (as property received by him on the liquidation distribution, but under section 334 [3] of the 1954 Code), assigned them a valuation of $300,000 and paid income tax on such amount computed as a capital gain. This action on petitioner's part was not questioned by respondent at that time.

Thereafter, petitioner continued his collection efforts as to the white files and earned fees of about $124,000 from June 1 through November 30, 1955. By December 31, 1958, petitioner had realized such fees totaling almost $275,000.

The case of *United Mercantile Agencies*, 34 T.C. 808, is concerned with the above facts. In such case the Commissioner determined that the valuation of $300,000 used by F. W. Drybrough in connection with the white files was based on that portion of such fees which had *been earned* or *were attributable* to the corporation's efforts before its dissolution since such white files were then about one-half processed. The Commissioner's position was that there had been an effective assignment to Drybrough of the right to receive fees totaling $300,000 and the determination therefore increased the corporation's income by that amount.

In deciding that the corporation had not earned any income from the white files "transferred" to Drybrough on dissolution, we said:

Both parties are agreed that the only question for determination in the instant case is whether petitioner had "earned" any income from the White Files transferred to Drybrough on May 31, 1955, and, if so, the amount thereof. The question presented is a factual one. In *Jud Plumbing* there was a clear factual situation revealing that the corporation had performed a portion of the work involved in certain contracts and the aliquot part of the income realized from such contracts as of the date of dissolution was readily determinable. Actually,

---

[3] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(a) GENERAL RULE.—If property is received in a distribution in partial or complete liquidation (other than a distribution to which section 333 applies), and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution.

the corporation had received a substantial portion of the money due it prior to dissolution. The fact that the corporation utilized a system of accounting which did not report income until a contract was actually completed was not allowed to prevent the allocation of that income to the corporation upon liquidation.

The situation in the instant case is entirely different. Here, the only income which could be realized from the White files consisted of fees which were wholly contingent upon the actual collection of all or a part of the delinquent accounts. It mattered not how much time, money, and effort were expended upon an attempt to collect. No contractual or *quantum meruit* right arose from such expenditures. No conceivable income could accrue for services rendered which failed to produce the collection of the accounts. None of the White files turned over to Drybrough had been collected. Unsuccessful attempts to collect had produced nothing of value whatsoever.

* * * A letter or telephone call to a delinquent debtor which produces no payment is worthless. A collector who calls in person upon the debtor and fails to collect has produced nothing of value.

*	*	*	*	*	*	*

There is no basis in the instant case for the proposition that any of the income ultimately realized from the White files had been earned by or was "properly payable" to petitioner.

*	*	*	*	*	*	*

In the instant case there is no doubt that Drybrough expected to, and actually did, collect a substantial amount of the delinquent accounts represented by the White files, but there was no assurance that he would do so, and certainly no assurance as to what amount, if any, he would collect. Petitioner had not, on May 31, 1955, earned any of the fees ultimately collected by Drybrough on the White files. Accordingly, respondent's determination that petitioner realized taxable income in the amount of $300,000 upon the dissolution of petitioner on May 31, 1955, is not sustained.

While the above case (*United Mercantile Agencies*) was pending, the respondent made a determination against F. W. Drybrough for the years 1956, 1957, and 1958, and involving several facets of the collection agency's business other than the white files.

This case is styled *F. W. Drybrough*, 42 T.C. 1029, on appeal (C.A. 6).

In August 1960 we decided *United Mercantile Agencies* and the respondent shortly thereafter filed an amended answer in *F. W. Drybrough* wherein he determined that the contingent fees earned by Drybrough on the white files and totaling almost $275,000 by December 31, 1958, were taxable to him as ordinary income.

The burden of proof of such determination was upon respondent.

As noted above, Drybrough had set the white files up on his proprietorship books when he acquired them in 1955 and had assigned to them a value of $300,000. During the years 1956, 1957, and 1958, he reported no gain on the contingent fees of $275,000 which he received from "working" the white files but treated this amount as in reduction of the $300,000 basis he had assigned to them en masse on the theory

that each white file had a value but that the value of each was speculative and different, making it impractical and impossible to apportion the total value of $300,000 among the 7,000 individual items and giving him the right therefor to treat the amounts received as in reduction of basis (until the entire $300,000 was thus exhausted) and as ordinary income thereafter. This method was consistent with the rationale of *Burnet* v. *Logan*, 283 U.S. 404 (1931); *Webster Atwell*, 17 T.C. 1374 (1952); *William T. Piper*, 5 T.C. 1104 (1945), and similar cases.

Respondent urged that since the white files had not been recorded as an asset on the corporate books and no formal conveyance of them made to Drybrough, they had no value upon liquidation and therefore no basis in Drybrough's hands. We held it to be clear that the files did have a value on the date of liquidation in spite of the fact that the corporation had not yet earned any income from them; that to anyone engaged in the business of collecting delinquent accounts such files were one of the main assets, and that respondent had introduced no evidence to show that the $300,000 value assigned to the white files by Drybrough was in any way unreasonable.

Respondent, with the burden of proof, did not show or attempt to show that the white files were a mass asset which would constantly be replenished by new accounts and were therefore of a similar character to nondepreciable goodwill, but contented himself with the additional argument that they were not capital assets but represented personal service contracts to be performed in the future.

We pointed out that the cases dealing with personal service contracts were not in point since they involved situations where the transferors were obligated to perform and had attempted to sell such *employment* contracts hoping thereby to convert ordinary income into capital gain.

On this posture of the issue we concluded and held that respondent had failed his burden. The most notable aspect of respondent's presentation was that he did not argue or attempt to prove that the white files were a mass asset within the rationale of *Richard M. Boe*, 35 T.C. 720, affd. 307 F. 2d 339 (C.A. 9, 1962); *Westinghouse Broadcasting Co.*, 36 T.C. 912, affd. 309 F. 2d 279 (C.A. 3, 1962); *Thrifticheck Service Corporation*, 33 T.C. 1038, affd. 287 F. 2d 1 (C.A. 2, 1961); *National Weeklies* v. *Commissioner*, 137 F. 2d 39 (C.A. 8, 1943), affirming a Memorandum Opinion of this Court; *Anchor Cleaning Service, Inc.*, 22 T.C. 1029; *U.S. Industrial Alcohol Co.*, 42 B.T.A. 1323 (1940), affirmed on this issue 137 F. 2d 511 (C.A. 2, 1943); *The Danville Press, Inc.*, 1 B.T.A. 1171 (1925); and *Successful Farming Publishing Co.*, 23 B.T.A. 150, affirmed sub nom. *Meredith Pub. Co.* v. *Commissioner*, 64 F. 2d 890 (C.A. 8, 1933).

It is precisely such rationale which the petitioner in the instant case has, in our opinion, proved and successfully supported.

It is undisputed that the principal business activity of the proprietorship was the handling of and collections made upon the white files. It is also clear that the parties expected identical activities to be carried on without interruption and from the same location after the sale to UMA, Inc., on February 28, 1959. The agreement provided, *inter alia* (par. 12), that until the purchase price and every note had been paid in full the corporation should maintain and keep its offices and properties in good repair, working order, and condition and should "carry on and conduct the business presently operated by the Proprietorship in substantially the same manner and at the same location as at present." The agreement also provided (par. 7) that until the purchase price had been paid in full UMA, Inc., should furnish petitioner a copy of a trial balance promptly after the end of each calendar month and that petitioner would thereupon lend to the corporation an amount equal to any loss shown at an extremely favorable rate of interest.

"Existence of 'good will' and the value thereof are primarily questions of fact which 'must necessarily be considered in the light of (the) facts in each case.' * * * 'Good will' value does not exist 'separate and apart from the property right to which it is incident.' " *Miller* v. *Commissioner*, 333 F. 2d 400–404 (C.A. 8, 1964), affirming *A. T. Miller*, 39 T.C. 940. The facts in the instant case make it abundantly clear that goodwill did exist in the business which was transferred from petitioner to UMA, Inc., and that it was closely and principally related to the white files. They were petitioner's main business activity and over a long period of time they had come in, largely unsolicited, because of past contacts, experience, reputation, and results.

It is equally clear that they were a mass asset, close kin to those dealt with in the above cited cases. *Anchor Cleaning Service, Inc.*, dealt with lists of accounts of approximately 500 customers for window and general cleaning service, which had been sold. These accounts were personal service accounts which could be freely discontinued by the customers and were not enforceable contracts. Petitioner (buyer) sought to deduct as depreciation or as business losses not compensated for by insurance or otherwise, the "losses" occasioned by reason of the discontinuance by certain customers on the lists. We held (pp. 1033–1035):

It is quite clear that the acquisition of the accounts in question constituted a capital investment and that the principal element of the property so acquired was goodwill. * * * Furthermore, since the element of goodwill is involved, it is also clear that such deductions are not allowable * * *

* * * It is petitioner's contention that here there was a purchase of separate accounts, so evaluated and bargained for, and acquired for a consideration which equaled the total of the purchase prices individually so assigned to each.

On the other hand, respondent takes the position that the accounts in controversy constitute one asset, consisting largely of goodwill, * * * Respondent, therefore, argues that any increase or decrease in the number of such customers would be merely an incidental fluctuation of the whole listing; that, while such may cause a corresponding fluctuation in the value of the asset, goodwill, the entire asset itself is not thereby lost; and that any loss deduction must await a final disposition thereof. * * *

\*     \*     \*     \*     \*     \*     \*

the accounts acquired by petitioner through Shapiro from his vendors constituted a single intangible asset in the form of a list of customers, * * * What petitioner actually is seeking here is a deduction for a partial loss of a capital investment, which deduction is not permitted under the Code. Rather, any such deduction must await the final disposition of the capital investment. * * *

*U.S. Industrial Alcohol Co.* dealt with the transfer of some 200 sales contracts with customers and brokers or jobbers for delivery of pure and denatured alcohol. Petitioner (buyer) claimed a deduction on the expiration of such contracts as though they were a wasting asset. In denying such deduction we said (pp. 1345–1346):

they are to be treated as of no different consequence than unfilled customer's orders in other lines of business.

This reduces the present problem to a comparatively simple question: Where a going business is purchased, the buyer acquiring good will along with other assets, do orders on the seller's books constitute a divisible asset capable of separate valuation, or are they merely the current evidence of a continuing operation, the value of which is included in "good will" and without which it would be evident that no "good will" existed? We think the latter view must be adopted. * * * It is impossible to conceive of a going business with a good will of any value without present as well as future customers. See *Pevely Dairy Co.*, 1 B.T.A. 385, 390, 391. That these present customers are represented, pursuant to the general custom of the trade, by purchase "contracts", creates, as we have said, no distinction from other "manifestations" of the same situation, for example, subscribers to publications, the existence of which furnishes no separate depreciable item. *Successful Farming Publishing Co.*, 23 B.T.A. 150; affirmed sub nom. *Meredith Publishing Co.* v. *Commissioner*, 64 Fed. (2d) 890; certiorari denied, 290 U.S. 646; *Danville Press, Inc.*, 1 B.T.A. 1171. Only such contracts under the circumstances shown could have demonstrated the existence of any good will. Since the contracts were merely the embodiment of such good will in so far as current business was concerned, and, since good will is not depreciable property, we conclude that the asset which petitioner seeks to depreciate, being but a part of a larger whole not subject to depreciation, was not susceptible of such treatment. [Footnotes omitted.]

*Richard M. Boe* dealt with petitioners' attempted deduction of the "cost" of certain terminated medical service contracts which were a part of about 9,000 such contracts which had been purchased. Said contracts were terminable at will by either party upon written notice. In denying such deductions as either a business expense or depreciation we said (pp. 724–725):

Petitioner presents a variation on a rather settled theme. The courts have on numerous occasions held that subscription lists and similar items constituted a single capital asset, and as such continued to have value despite fluctuations

and alterations. *Thrifticheck Service Corporation*, 33 T.C. 1038 (1960), on appeal (C.A. 2) ; *Metropolitan Laundry Co.* v. *United States*, 100 F. Supp. 803 (N.D. Cal. 1951). These decisions involved newspaper subscription lists, *The Danville Press, Inc.*, 1 B.T.A. 1171 (1925) ; magazine circulation structures, *Meredith Pub. Co.* v. *Commissioner*, 64 F. 2d 890 (C.A. 8, 1933) ; insurance policyholders, *Commercial National Insurance Co.*, 12 B.T.A. 655 (1928) ; natural gas consumers, *Houston Natural Gas Corp.* v. *Commissioner*, 90 F. 2d 814 (C.A. 4, 1937) ; cleaning service customers, *Anchor Cleaning Service, Inc.*, 22 T.C. 1029 (1954) ; and contracts of checking account system customers, *Thrifticheck Service Corporation, supra.*

Petitioner has shown us nothing to indicate that the contracts here in issue were not a collective, single asset. In fact, the record is most persuasive that they were. * * *

The mass asset concept is no Johnny-come-lately. *The Danville Press*, decided in 1925 and reported in 1 B.T.A. 1171, dealt with petitioner's (buyer's) right to depreciate pro rata 9,000 subscriptions as they expired. They had been purchased as a part of all the assets of a corporation publishing a daily newspaper. The Board of Tax Appeals said at page 1172 :

This necessarily involves the proposition that at the end of such period the subscription list purchased by it had no value. We can not agree that this is so, nor can we agree that what the taxpayer purchased was 9,000 contracts expiring within 12 months. It purchased an asset which was a subscription list subject to fluctuations from time to time.

It is also clear that petitioner's ordinary expenses in *maintaining* his inventory of white files (as opposed to extraordinary expenses designed to build up or augment such inventory) were deductible as an ordinary and necessary business expense. This precise question was dealt with in *Meredith Pub. Co.* v. *Commissioner, supra* (affirming *Successful Farming Publishing Co.*, 23 B.T.A. 150), the court saying at page 893 :

In this manner the integrity of the circulation structure in each year is maintained. The deductions permitted partake of the nature of allowances for depreciation or amortization, for which petitioner contends, and take care of the matter in a practical way and with least complexity and confusion. * * *

It follows that in our view the white files were a single intangible mass asset in the nature of goodwill and that the gain attributable thereto ($395,000 less petitioner's unrecovered cost basis of $25,444.15) is long-term capital gain.

The situation as to the green files and gold files was quite different. Whereas the white files consisted of choses in action belonging to others which were simply being "worked" by petitioner so that, hopefully, collections would be made and the contingent fee realized; the green files and the gold files were choses in action which had been purchased by petitioner from time to time and which he was collecting for his own account.

Petitioner's business was the operation of a collection agency. It is true that his principal function was the collection of accounts for others but we note that, dealing at arm's length, petitioner valued that portion of his business at just under $400,000 and valued the green files and the gold files at almost $300,000. It is thus apparent that the green files and the gold files constituted a substantial portion of petitioner's business.

Furthermore, we conclude from the facts that the ownership and the working of the green and gold files by petitioner was an integral part of his business.

Petitioner had on a few occasions sold gold files but his usual activity as to them and as to the green files was to process, or attempt to collect on them through his organization by the same means employed as regards the white files, and with no attempt to segregate expenses and overhead as between the colors.

Petitioner contends that they were capital assets within the definition of section 1221 of the Internal Revenue Code of 1954 [4] but in our view they fall precisely within the exclusion of 1221(1) under the teaching of *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52:

Congress intended that profits and losses arising from the *every-day operation of a business* be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by * * * [section 1221] applies to transactions in property which are not the *normal source of business income*. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." * * * Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in * * * [section 1221]. See *Hort* v. *Commissioner*, 313 U.S. 28, 31; *Kieselbach* v. *Commissioner*, 317 U.S. 399, 403. [Emphasis supplied.]

See also *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260.

When viewed in this light it is clear that they were, in fact, a part of petitioner's "stock in trade," properly includable in inventory; and though petitioner's actual sales of them were few, yet, his collections upon them were, in a sense, tantamount to sales.

It follows that petitioner's gain, the amount of which has been stipulated, on the sale of the green files and the gold files is taxable to him

---

[4] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

as ordinary income and the subsidiary questions as to petitioner's holding period and as to whether any part of such gain is properly interest, are moot.

*Decision will be entered under Rule 50.*