FRANKFORD–QUAKER GROCERY CO.

v.

UNITED STATES of America.

Civ. A. Nos. 68–1849, 69–1761.

United States District Court,
E. D. Pennsylvania.

Dec. 29, 1972.

Lloyd J. Schumaker, Philadelphia, Pa., for plaintiff.

Risden C. Ackerman, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

GORBEY, District Judge.

This action, to recover taxes paid by the plaintiff after the defendant disallowed deduction of certain payments, as being improperly taken under § 162(a) of the Internal Revenue Code of 1954, was tried without a jury. The payments in question were made by the plaintiff corporation while its competitors were in the process of liquidation and it was absorbing the business operations of these competitors.

### I

The factual background against which these payments were made is as follows:

Prior to 1962, three economic cooperatives of retail grocers operated in the

City of Philadelphia; they were the Frankford Grocery Co. (hereinafter referred to as Frankford), the Penn Mutual Grocery Co. (hereinafter referred to as Penn Mutual) and the Quaker City Wholesale Grocery Co. (hereinafter referred to as Quaker). After 1962, the plaintiff, Frankford-Quaker Grocery Co. (hereinafter referred to as Frankford-Quaker) remained as the only economic cooperative of retail grocers in Philadelphia.

The combination of the business operations resulted from a series of events which follow. During 1961, discussions of possible mergers were held between Frankford and Penn Mutual. Similarly, during that year, discussions were held between Frankford and Quaker. As a result of these discussions and investigation by counsel, statutory mergers between Frankford and Penn Mutual and Frankford and Quaker were rejected. However, an agreement to combine the operations of Frankford and Penn Mutual and a plan to carry out the combination were set forth in a January 31, 1962 letter. The terms of agreement were modified in a February 15, 1962 document. An agreement to combine the operations of Frankford and Quaker and a plan to carry out the combination were set forth in a letter dated February 5, 1962. This agreement was modified in a February 27, 1962 amendment. Penn Mutual ceased operations on January 31, 1962 and was subsequently liquidated. Quaker ceased operations on May 10, 1963 and was subsequently liquidated.

The Frankford-Penn Mutual Plan required acceptance by at least 80% of Penn Mutual shareholders. It provided for a tentative exchange of stock at a 2 to 1 ratio which would be subject to a later reduction to adjust for the ultimate liquidation price of Penn Mutual. The February 15th modification provided for severance payments to some 16 employees of Penn Mutual and required that suitable non-competitive agreements be signed by these employees. The February 5th plan for the integration of Frankford and Quaker also required acceptance by 80% of Quaker shareholders. It provided a tentative exchange ratio for the stock which would ultimately be subject to the liquidation price of Quaker shares. In addition, it required that the Board of Directors of Frankford be increased to 17 which would include 5 members to be designated by Quaker. It provided for the liquidation of Quaker at the sole discretion of the Frankford Directors. It also provided that the Frankford Grocery Co. would change its name to Frankford-Quaker Grocery Co. The February 27th agreement between Frankford and Quaker provided for payments to certain Quaker employees. These payments were made contingent upon Quaker grocers continuing their withdrawals at 90% or more of their previous level for the three-year period following acceptance. The corporate agreement further provided that the payments were conditioned upon execution of individual non-competitive agreements.

Prior to these negotiations and agreements, Frankford had approximately 1800 member grocers; Penn Mutual had approximately 200 member grocers; and Quaker had approximately 600 member grocers. After the liquidation of Penn Mutual and Quaker, Frankford-Quaker had approximately 2600 member grocers. Frankford-Quaker hired 111 former employees of Penn Mutual and Quaker. At the time of the negotiations, the Frankford Board had 15 members, subsequently the board was expanded to 17 members, 4 of the old members resigned, 5 members selected by Quaker were added and 1 member selected by Penn Mutual was added. Frankford-Quaker acquired the inventories of both Penn Mutual and Quaker. The inventory of Penn Mutual was acquired at a price determined by arbitration. The inventory of Quaker was acquired at Quaker's cost. Frankford-Quaker did not acquire Penn Mutual's warehouse facilities. Frankford-Quaker bought all rolling stock and some warehouse equipment of the Quaker Co. at an appraised price. The name of the Frankford Gro-

cery Co. was changed to Frankford-Quaker Grocery Co.

The plaintiff agreed to the combination of the business operations in order to enable the member retailers of Penn Mutual and Quaker to remain competitive. From time to time, retail members of Penn Mutual and Quaker had applied to the plaintiff for membership, but were refused.

During this period of time, the plaintiff made several payments, the tax status of which is now at issue.

On June 29, 1963, the plaintiff paid Quaker $85,000 and deducted this payment as an expense on its tax return for the fiscal year ending June 29, 1963. After Frankford and Quaker entered into the agreement, Quaker continued to operate its warehouse until its lease expired in June, of 1963. To facilitate integration of the operations, Frankford began to service some 35 to 50 of Quaker's largest members from its warehouse in early 1962, i. e. before April 1962. The remainder of Quaker's members were not transferred until Quaker ceased operations in May, 1963. The transfer of customers prior to liquidation resulted in an increase in Frankford's marginal income of $90,364.00, and a resulting decrease in Quaker's marginal income of $84,199.00. Accordingly. Frankford's Board in June, 1963, approved a payment to Quaker of $85,000 to reimburse them for the loss of income during the transition period.

Second, $25,685.50 was paid by the plaintiff to former employees of Penn Mutual. As employees of Penn Mutual became unemployed, due to the acceptance of the Frankford proposal by Penn Mutual members and the termination of operations, Frankford made severance payments to them based on one week's pay for every two years they had been employed by Penn Mutual. Each of the employees of Penn Mutual who received these severance payments was required to, and did, execute an agreement that they would not enter into competition with Frankford-Quaker. Some payments

were made to clerical employees who had no unique skills which would injure Quaker if they were employed by a competitor. Payments were also made to employees who spent most of their professional lives in the wholesale grocery business. All parties knew that these employees would, of necessity, become employees again in the wholesale grocery business. No officer or employee of the plaintiff ever actively attempted to determine if any of the employees who signed the agreement engaged in employment in a competing business within in a year following the termination of this employment with Penn Mutual.

Third, during the fiscal year of 1962, the plaintiff paid its counsel $7,000, which both parties agree was reasonable, for the services performed. During that year, counsel attended numerous conferences with the officers and directors of Penn Mutual, Quaker and Frankford to explore the possibilities of a statutory merger. As a result of the conferences, and the analysis of the facts by its counsel, Frankford was advised not to consent to the stautory merger with either Penn Mutual or Quaker. Counsel also performed services in connection with the processing, financing and assimilation of a large number of grocers and employees into the plaintiff's organization. The services effecting necessary financial arrangements with Frankford's bank were of the sort usually performed by Frankford's counsel in connection with handling new members. Frankford's counsel is not only its legal advisor but also its principal financial advisor.

Each of the aforementioned payments was disallowed by the Internal Revenue Service as an ordinary and necessary expense of the plaintiff taxpayer's business.

II

It is the plaintiff's contention that each of these expenditures was properly scheduled under § 162(a) of the Internal Revenue Code of 1954, (26 U.S.C.) as a

trade and business expense. That section provides in part:

" § 162 *Trade and business expenses.*

(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . "

It is the defendant's position that these expenditures should have been treated as capital expenditures under § 263 of the Internal Revenue Code of 1954. That section provides in part:

" § 263 *Capital expenditures.*

(a) General rule.—No deduction shall be allowed for—

(1) any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate . . . "

Federal tax regulations included in the Federal Code of Regulations, Title 26—Internal Revenue, 1954 provide further:

"§ 1.263(a)—2 *Examples of Capital Expenditures.*

The following paragraphs of this section include examples of capital expenditures: . . .

(h) The cost of goodwill in connection with the acquisition of assets of a going concern is a capital expenditure."

The classification of expenditures as ordinary and necessary expenses or capital expenditures presents a difficult question for the court. The general distinction was advanced in United States v. Akin, 248 F.2d 742 at 744 (10th Cir. 1957), cert. denied, 355 U.S. 956, 78 S. Ct. 542, 2 L.Ed.2d 532 (1958) which stated:

"It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the *acquisition of an asset* having a period of useful *life in excess of one year* or if it *secures a like advantage* to the taxpayer which has a *life of more than one year.*" [Emphasis added]

§ 25.20 of Merten's Law of Federal Income Taxation provides further background for the treatment of such expenditures. It reads in part:

"Section 162 of the 1954 Code is intended primarily, although not necessarily, to cover expenditures of a recurring nature where the benefit derived from the payment is realized and exhausted within the taxable year. Accordingly, if as a result of the expenditure, the taxpayer acquires an asset which has an economically useful life beyond the taxable year or if it secures a like advantage to the taxpayer which has a life of more than one year, no deduction for such a payment is allowable as a business expense. In such event, to the extent that the deduction is allowable, it must be obtained under the provisions of the Code which permit deductions for amortization, depreciation, depletion, or loss . . . Generally, the courts have sought to determine whether the expenditure in question has resulted in ultimate advantage to the taxpayer. If it has, the expenditure has been treated as representing a permanent improvement, that is, a capital expenditure; if it has not, it has been characterized in the nature of current upkeep or repairs."

In determining the proper treatment of the expenditures at issue, it would appear necessary to first determine what asset was acquired, or what advantages were secured, by the taxpayers as a result of making these expenditures; then determine whether or not the benefit derived from the asset or advantage is realized or exhausted within the taxable year. We will therefore analyze each of the expenditures according to the foregoing criteria.

## III

During the fiscal year, 1962, the plaintiff paid its counsel $7,000.00 as a reasonable compensation for legal and financial services. These services led to the plaintiff's rejection of a statutory merger and ultimate assimiliation into its business of grocer members of Penn Mutual and Quaker.

The defendant contends that these expenditures were incurred by the plaintiff to accomplish a merger. Section 26.-35 of *Merten's* points out:

"Expenditures for organizing, recapitalizing, merging or dissolving a business enterprise may properly be said to be sui generius. On one hand, none of them can hardly be considered as part of the cost of operating the business for the taxable year in which they were paid or incurred. On the other hand, it is arguable that no capital asset is acquired by the taxpayer which, as a business enterprise, is being organized, capitalized, merged or dissolved . . . . Such expenditures have been characterized as being 'something intangible with an indefinite life'."

Costs incurred for accounting services (Beneficial Industrial Loan Corporation v. Handy, D.C., 16 F.Supp. 110, aff'd., 92 F.2d 74 (3d Cir. 1937), Bush Terminal Buildings Co., 7 T.C. 793 (1946), aff'd., 204 F.2d 575 (2d Cir. 1953), cert. denied, 346 U.S. 856, 74 S.Ct. 72, 98 L.Ed. 370 (1953)) and legal fees (Skenandoa Rayon Corporation v. C. I. R., 122 F.2d 268 (2d Cir. 1941), cert. denied, 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 556 (1941), Motion Picture Capital Corp. v. Comm., 80 F.2d 872 (2d Cir. 1936)) to accomplish a statutory merger or reorganization are said to benefit an indefinite future period and therefore require capitalization. The same reason was advanced in General Bancshares Corp. v. Comm., 326 F.2d 712 (8th Cir. 1964), cert. denied, 379 U.S. 832, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964), to require expenditures incurred in the issuance of a stock dividend to be capitalized.

The plaintiff argues that the failure to consummate a statutory merger precludes these expenses from being capitalized. Interests of parties, however, should not be determined by whether or not a statutory merger took place. See Rath v. Rath Packing Company, 257 Iowa 1277, 136 N.W.2d 410 (1965). If the corporate action taken has similar consequences to the consequences of the statutory merger, then expenditures made for professional services to bring about that action should be classified in the same way as the expenditures for professional services to bring about a merger.

The business combination took place pursuant to the agreements of January 31, 1962 and February 5, 1962. A statutory merger is but one form of business combination which improves an entity's future competitive position. While the plaintiff's primary motive for accomplishing the business combination was to enable grocer members of Quaker and Penn Mutual to remain competitive, motive is not the controlling factor. In similar cases, where courts have been asked to determine whether expenditures for litigation to defend property rights are capital expenditures or ordinary expenses, motive has been rejected as the proper test. Anchor Coupling Co., Inc. v. United States, 427 F.2d 429 (7th Cir. 1970). While no asset was acquired by this expenditure, the legal and financial services obtained enabled a business combination to take place which did give the plaintiff a like advantage (i. e. They received the same advantage from this expenditure as they would receive from the acquisition of other intangible assets such as goodwill or organization costs.).

The business combination has already produced benefits to the plaintiff. Frankford's marginal income increased by some $90,300.00 in 1962 and 1963, as a result of the customers transferred from Quaker. Further, benefits should continue to accrue since Frankford-Quaker has eliminated employees and facilities thereby reducing overhead.

Frankford-Quaker has also expanded its capital base. All of these benefits should continue for an indefinite period.

■■ The plaintiff has argued that the legal fees were incurred for services leading up to the rejection of the merger and, as such, confer no benefit on future periods (thereby making them a current expense). Legal fees for the rejection of a merger do not require capitalization (Sibley, Lindsay & Curr Co., 15 T.C. 106 (1950) *Cf.* Arcade Co. v. United States, D.C., 97 F.Supp. 942, aff'd, 203 F.2d 230 (6th Cir. 1953) cert. denied, 346 U.S. 828, 74 S.Ct. 48, 98 L.Ed. 358 (1953)). However, the plaintiff has also argued that the fees were paid partly for financial advice for the addition of new members. Since the plaintiff cannot identify the amount expended to investigate and reject the statutory merger, and the amount to investigate the ultimate business combination, there can be no current deduction (Peaslee-Gaulbert Co., 14 B.T.A. 769 (1928)). There must be some basis upon which an allocation can be made F. W. Drybrough, 45 T.C. 424, aff'd., 384 F.2d 715 (6th Cir. 1967).

The $7,000.00 attorney fees are therefore capital expenditures and the plaintiff is not entitled to a deduction under § 162.

## IV

■ During the fiscal year ending June 30, 1962, Frankford-Quaker paid $25,685.50 to former employees of Penn Mutual. These payments were ostensibly made to obtain a covenant not to compete which was signed by each employee. Some of these covenants were executed by clerical employees without skills which are unique to the grocery industry. Other employees who executed these covenants had spent most of their working lives in the grocery industry. The plaintiff knew that the latter group would obtain employment in the grocery industry, but made no attempt to determine whether the covenant was being honored. Accordingly, we find that no business purpose was served by the execution of these covenants.

The payments were made in accordance with the February 15, 1962 modification of the agreement to combine the businesses. Payment by Frankford was conditioned upon Penn Mutual grocers continuing to purchase at a rate equal to 90% of their purchases from Penn Mutual. The purpose of these payments was to lessen the impact of the termination of operations on Penn Mutual employees who were not being retained. Penn Mutual was not obligated to make these payments. Obviously, Frankford was not obligated to make any payment to Penn Mutual employees until they agreed to do so in the February 15, 1962 agreement.

The questions presented are: 1. what asset or like advantage was acquired as a result of the payment? and 2. what period will benefit from the expenditure?

■ If any asset or like advantage was acquired by Frankford, it was employee goodwill; a belief by the Penn Mutual employees who were joining Frankford-Quaker that the new company had some paternalistic instincts. Such goodwill would seem to benefit an indefinite future period lasting as long as the employees remained employed by Frankford. We see no difference between payments made for customer goodwill and employee goodwill when it comes to determining the tax treatment of such payments. Both of them are made to obtain a competitive advantage; customer goodwill to obtain future patronage of customers, employee goodwill to obtain future efficiency from less apprehensive employees. Payments made as part of a business combination for customer goodwill have long been recognized as capital expenditures. The Pevely Dairy Co., 1 B.T.A. 385 (1924); Anchor Cleaning Service, Inc., 22 T.C. 1029 (1954); Skilken v. C.I.R., 420 F. 2d 266 (6th Cir. 1969). We believe that the same sort of benefit is acquired from payments made as part of a business combination for employee goodwill.

The plaintiff seeks to distinguish these payments from payments for goodwill since they were made directly to terminated employees. It points out goodwill payments are usually made to the acquired corporation. The structure of the transaction, however, makes no difference in determining what asset or like advantage was acquired and what period was benefited. Whether this payment was made by Frankford to Penn Mutual which then distributed it to the employees or whether the payments were made by Frankford directly to the Penn Mutual employees makes no difference in determining what advantage Frankford gained from the payments. The tax law has long recognized substance takes precedence over form. Comm. v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 (1946).

The plaintiff is therefore not entitled to a deduction under § 162(a) of the $25,685.50 paid to Penn Mutual employees.

### V

On June 29, 1963, the plaintiff paid Quaker $85,000.00 to reimburse Quaker for its loss of income resulting from Frankford beginning to supply 35 to 50 of Quaker's largest customers from its warehouse instead of Quaker's.

Defendant argues this payment "had its origin in the merger" which makes it a capital transaction. It has been recognized that all payments made pursuant to the acquisition of a business are not necessarily acquisition costs. Southern Massachusetts Oil Corp., 25 C.C.H. Tax Ct. Mem. 614 (1966). The appropriate analysis to determine whether or not a payment was a capital expenditure is to determine what asset or like advantage was acquired, then determine the period which benefited from that expenditure. The first problem is to determine what asset or like advantage was acquired for the payment. No tangible property was received in exchange for the payment. Nor was the payment made to obtain the customer list of Quaker. Customer lists have long been considered capital assets. Union National Bank, 18 B.T.A. 468 (1929); Manhattan Co. of Virginia, Inc., 50 T.C. 78 (1968); Richard M. Boe, 35 T.C. 720 (1961), aff'd., 307 F. 2d 339 (9th Cir. 1962). The members of Quaker had become members of Frankford with their acceptance of the agreement; therefore, Frankford already had access to Quaker's customers before they agreed to make this payment. The payment was made to reimburse Quaker for its loss of marginal income occasioned by the transfer of customers. Both Frankford and Quaker recognized that Quaker's fixed expenses (taxes, administrative salaries, etc.) would continue after Frankford began to service these customers. Without the revenues provided by these customers, Quaker's income would be reduced thereby increasing its operating loss. Similarly, Frankford's fixed expenses would remain the same; it would increase its profits for the current year to the extent its charges to Quaker customers exceeded its incremental costs for such things as packaging and delivering. The advantage that Frankford obtained from this transaction was a $90,364.00 increase in profit for the period. In exchange for that advantage, they paid Quaker $85,000.00, which approximated Quaker's loss of marginal income of $84,-199.00.

In Interstate Transit Lines v. C.I.R., 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943), rehearing denied, 320 U.S. 809, 64 S.Ct. 26, 88 L.Ed. 489 (1943), the United States Supreme Court refused to permit a corporation to deduct the reimbursement of a subsidiary's operating loss as an ordinary and necessary expense. After acceptance of the February 5, 1962 agreement, Quaker could be considered a subsidiary of Frankford. Shareholders of 80% of Quaker's stock executed assignments to Frankford. Further, paragraph 3(e) of the agreement provided, "Quaker shall be operated as a subsidiary of Frankford". The existence of the parent sub-

sidiary relationship, however, was not controlling in *Interstate*. While the court acknowledged that the profit earned by the subsidiary would increase *Interstate's* profits, it pointed out, "The assumption of the deficit was not dependent upon a corresponding service or benefit rendered to the petitioner." The tax court has permitted the parent to reimburse his subsidiary for operating losses where it served as an adjustment to the price of goods furnished by the subsidiary to the parent, (Fishing Tackle Products Co., 27 T.C. 638 (1957)), and where the subsidiary performed services exclusively for the parent (Texas and Pacific R. R., 1 C.C.H. Tax Ct. Mem. 863, (1943)).

■ In the case sub judice like *Interstate*, no goods were sold nor services rendered by Quaker to Frankford. The court recognized in Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1939), the deductions did not turn upon equitable considerations, but depend upon legislative grace requiring "a clear provision therefor" if they are to be allowed. "[T]he taxpayer who sustained the loss is the one to whom the deduction shall be allowed. Had there been a purpose to depart from the general policy in that regard, and to make the right to the deduction transferrable or available to others than the taxpayer who sustained the loss, it is but reasonable to believe that purpose would have been clearly expressed." New Colonial Ice Co. v. Helvering, 292 U.S. 435, at 440–441, 54 S.Ct. 788, at 791, 78 L. Ed. 1348 (1934). Further, the fact that payments were made pursuant to a binding legal obligation does not control their tax treatment. White v. Fitzpatrick, 193 F.2d 398 (2d Cir. 1951).

Quaker sold no goods nor rendered any services to Frankford which would permit it to reimburse the operating loss under the court's adjustment of price theory. In exchange for the agreement to reimburse the loss, Frankford did receive the right to service Quaker's largest customers for one year without having to serve its smaller ones. The record shows that this right did benefit Frankford in that profits increased by some $90,000.00. At first glance, it appears that this right is a nullity. The terms of the February 5th agreement provide:

"3(c) Active Quaker retail grocers who accept the exhange shall become members of Frankford-Quaker Grocers Association.

(e) Quaker shall be operated as a subsidiary of Frankford and active Quaker Retail Grocers shall be serviced by Quaker in distribution of food and merchandise so long as the Board of Directors of Frankford shall determine.

(g) Quaker Retail Grocers shall have no right to be supplied food and merchandise by Frankford . . . unless and until the Board of Directors of Frankford in its sole discretion shall determine."

This appears to give Frankford the sole discretion to terminate the servicing of customers at Quaker and commence servicing at Frankford. Paragraph 3(e) of the agreement provides only the right to *completely* terminate operations at Quaker. There has been no evidence that a partial termination was within the contemplation of the parties when this agreement was made. If the right of partial termination existed there would have been no need for the negotiations which were held before the partial transfer was accomplished. Partial transfer benefited Frankford since it permitted them to test their operations without the added problems of taking on the smaller less profitable grocers.

■ The court in *Interstate* disallowed deduction of the reimbursement of the subsidiary's losses as an ordinary and necessary expense because such reimbursement was "not dependent upon a corresponding service or benefit rendered to the petitioner". Here, Quaker has relinquished the right of servicing all its customers until termination of its warehouse operation, in exchange for an agreement to have its operating losses

from failure to serve these customers reimbursed by Frankford. Frankford has received a corresponding benefit by acquiring the right to serve only a portion of Quaker's customers without taking on the less profitable ones. The amount of its payment for this benefit is directly related to the benefit which it derived. As such, it is analogous to commissions for the referral of business which have long been permitted as an ordinary and necessary expense. (26 C.F.R. § 1.162–1(a)).

There is a further reason why classification of the expenditure as a capital expenditure is not appropriate in this case. Quaker was not *clearly* a subsidiary. In cases which disallow reimbursement of a subsidiary's operating loss, the payments serve to increase the parent's equity in the subsidiary. Here, Frankford's equity in Quaker is less clearly established. Frankford only held assignments for more than 80% of the stock of Quaker. In exchange for these assignments, Quaker shareholders would receive an as yet undetermined number of Frankford shares. That number to be dependent upon the ultimate liquidating price of Quaker.

In this transaction, Quaker shareholders benefited from the payment by Frankford since the receipt of this payment increased Quaker's equity.[1] The ultimate number of Frankford-Quaker shares to be received by Quaker shareholders in exchange for the Quaker shares they assigned to Frankford was to be determined by the liquidating value of Quaker shares. Obviously, any increase in Quaker's equity from the receipt of tangible assets, such as this $85,000 cash payment, would result in a higher liquidating value; therefore, Quaker shareholders would receive more Frankford-Quaker stock. This benefit to Quaker shareholders was at the expense of Frankford shareholders.[2] If Quaker were a wholly owned subsidiary of Frankford, the position of Frankford shareholders would not change as a result of this expenditure. It would simply be taking money from one pocket and putting it in another.[3] It is for that reason that the court in *Interstate* properly disallowed such expenditures where a wholly owned subsidiary was involved. Here, the Frankford shareholders made an expenditure for which they have no prospect of recovery. They should, therefore, be entitled to a deduction for that expenditure. This is not the same case as *Interstate*, where the expenditure was merely a change of pockets.

The defendant erred in disallowing the deduction of $85,000.00 as an ordinary and necessary expense under 26 U.S.C. § 162(a).

## VI

Finally, the plaintiff contends that even if he is not permitted to deduct any of these expenditures under § 162 (a), he may deduct them as patronage dividends. The theory for this deduction is that the plaintiff is required to distribute all of his profits as patronage dividends. Therefore, if any deduction is disallowed there is a corresponding increase in the amount of the plaintiff's

---

1. If recorded by Quaker as income (*i. e.* reduction of expenses), it would be closed to equity. If recorded as an investment (*i. e.* paid-in or donated capital), it would also be equity.

2. The payment reduced Frankford's equity (*i. e.* cash and equity) directly if charged to an expense, or indirectly if charged to a capital expenditure (such as an intangible asset which has no market value and which may not be ultimately recovered).

3. If Quaker were a one hundred percent owned subsidiary, the payment would decrease Frankford's cash while increasing its investment in the subsidiary. Quaker's cash and equity would also increase. As a wholly owned subsidiary any benefits from the increase in the equity of the subsidiary (Quaker) would inure to the parent (Frankford) and ultimately to its shareholders.

profits and the amount which the plaintiff is required to pay as a patronage dividend.

Their argument is based upon the proposition that since they made a mistake in determining the applicability of the deduction under one section of the code, they are not precluded from asserting it under another. See W. K. Buckley, Inc. v. Comm., 158 F.2d 158 (2d Cir. 1946).

Farmers Cooperative Co. v. C.I.R., 288 F.2d 315 (8th Cir. 1961), presented the policy question which is here at issue. Since the co-op failed to take sufficient action to make the income represented by the patronage dividend that of its patrons in the year it was earned, it should not be entitled to a deduction therefor. The income earned should be taxed either to the co-op by whom it is earned or the patrons to whom it is distributed. If the co-op is allowed to escape taxation because they misclassified an expenditure, the patrons would similarly escape taxation since the year in which the dividend was earned has already been closed.

■ While the court in *Farmers Co-op* permitted the Co-op to deduct the patronage dividend without having paid it, it recognized that there was no statute or regulation covering patronage dividends.[4] The court in *Farmers Co-op* stated:

"Of course, if there is a mandatory requirement by statute or valid regulation that certain conditions must be complied with to justify an exclusion, such requirements must be met."

While not applicable to the years which were before the court in *Farmers Co-op*, the Treasury, on September 16, 1959, promulgated revenue ruling 59–322

(1959 Cumulative Revenue Bulletin, 154, 155) which provides:

"[A]llocations and notifications of patronage dividends, made pursuant to a pre-existing obligation by a non-exempt cooperative after the close of the taxable year in which such patronage occurred, will be considered as made before the end of such taxable year if made on or before the due date for filing the Federal income tax return . . . for the year in which such patronage dividend occurred. Accordingly, such patronage dividends will be excluded from the income of the cooperative for that year."

That ruling by its terms was to apply only to the years ending subsequent to January 1, 1960. Allocations of patronage dividends must be made by the date of the return in order for the deduction to be allowed.

■ Since Frankford-Quaker had failed to allocate as patronage dividends before filing their tax returns the amounts which they scheduled on these returns as attorneys' fees and severance payments to Penn Mutual employees, they may not exclude them from income in 1962. Accordingly, the Commissioner did not err in disallowing the $7,000 and $25,685.50 deductions under the alternative theory that they were patronage dividends.

We find therefore that the plaintiff is not entitled to a deduction for the $7,000 which it scheduled as attorneys' fees or the $25,685.50 scheduled as severance payments under § 162(a) of the Code. The Commissioner erred, however, in disallowance of the deduction of $85,000.00 for the reimbursement of Quaker's operating loss under § 162(a) of the Code.

4. The enactment of sections 1381 through 1388 added to the Internal Revenue Code of 1954 by § 17(a) of the Revenue Act of 1962, P.L. 87–834, 76 Stat. 960 effective as of October 16, 1962, created new provisions covering cooperatives. § 1382(b)(1) and § 1388 would preclude the plaintiff's deduction of a patronage dividend in any year after 1963 under the theory advanced here.